Derrill LIFFRIG, Petitioner, Appellant,

v.

James D. O'Connell, Defendant-Appellant.

INDEPENDENT SCHOOL DISTRICT
NO. 442, OSLO, Minnesota,
Respondent.

No. 49877.

Supreme Court of Minnesota.

March 7, 1980.

Korstad, Lund, Soules, Erdall & McKendrick and William B. Korstad, Minneapolis, for appellant.

Myhre Drenckhahn & Williams and Arthur A. Drenckhahn, Warren, for respondent.

Heard before ROGOSHESKE, KELLY, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

The school board of Independent School District No. 442 at Oslo, Minnesota discharged their high school principal of 17 years, Derrill Liffrig, pursuant to proceedings under Minn. Stat. § 125.12, subd. 8, for "immoral conduct" and "conduct unbecoming a principal." The Marshall County District Court reviewed the board's findings and order by writ of certiorari and affirmed, although finding the result harsh. Liffrig has appealed that decision to this court, requesting reversal of the school board's findings and conclusion. Appellant questions whether the school board's findings are supported by substantial evidence in the record and whether he was afforded procedural due process by the circumstances surrounding his dismissal. We reverse and remand.

Appellant, in addition to his job as a high school principal, had been in charge of the school district's driver's education program for the entire 20 years he had been with the district. In August 1978, he was notified of proposed immediate termination pursuant to Minn. Stat. § 125.12, subd. 8 (1978).[1] The stated reasons for the proposed discharge were (1) that appellant charged the school district for hours of behind-the-wheel driver's training which were not given to the students, and (2) that appellant falsely certified to the State of Minnesota and to various insurance companies that students had completed the six hours of behind-the-wheel driver's training required by the state. After a hearing, the school board ordered immediate discharge based on its findings that appellant submitted double billings for at least 11 students to whom he had given driver's education and had made this misrepresentation intentionally, and that he had fraudulently and intentionally certified that at least two students had completed six hours of behind-the-wheel training when in fact they had completed less. Appellant argues that the board's findings that he intentionally misrepresented the hours of behind-the-wheel training given are not supported by the evidence. He also argues that the findings do not support immediate discharge for "immoral conduct" or "conduct unbecoming a principal," and that immediate termination of appellant based on the findings is so harsh as to be unreasonable and oppressive.

The record reveals the following facts:

In addition to acting as high school principal and driver's education program coordinator, appellant's duties were increased substantially during the school years 1967–68 and 1977–78, when he was working as acting superintendent for the district. Although during 1977–78 he appointed a vice-principal to take care of attendance matters, the bulk of the principal's duties remained his because the assistant principal was also teaching five classes. In addition, appellant was athletic director, responsible for hiring and compensating referees and scheduling athletic events. He was also

1. Minn. Stat. § 125.12, subd. 8, reads as follows:

Immediate discharge. A school board may discharge a continuing-contract teacher, effective immediately, upon any of the following grounds:

(a) Immoral conduct, insubordination, or conviction of a felony;

(b) Conduct unbecoming a teacher which requires the immediate removal of the teacher from his classroom or other duties;

(c) Failure without justifiable cause to teach without first securing the written release of the school board;

(d) Gross inefficiency which the teacher has failed to correct after reasonable written notice;

(e) Willful neglect of duty; or

(f) Continuing physical or mental disability subsequent to a twelve months leave of absence and inability to qualify for reinstatement in accordance with subdivision 7.

Prior to discharging a teacher the board shall notify the teacher in writing and state its ground for the proposed discharge in reasonable detail. Within ten days after receipt of this notification the teacher may make a written request for a hearing before the board and it shall be granted before final action is taken. The board may, however, suspend a teacher with pay pending the conclusion of such hearing and determination of the issues raised therein after charges have been filed which constitute ground for discharge.

A principal is a "teacher" within the meaning of the Statute. Minn. Stat. § 125.12, subd. 1.

transportation officer, managing the school bus system, occasionally driving a school bus himself if he could not find a substitute driver. In July 1977, he was appointed by the school board to be the district's representative on a Planning and Evaluation Task Force for a building program in progress. He was also working on an assistance project and a staff reduction project for the district.

As principal and director of the driver's education program, appellant arranged for classroom instruction to begin, arranged for the scheduling of behind-the-wheel instruction, obtained a training vehicle, and did most of the actual training. There was one other behind-the-wheel instructor in the district. Behind-the-wheel instructors were paid $5.00 an hour. There were no written board policies regarding driver's training, so the individuals doing the training were allowed to use whatever reporting system they wished and to submit a bill for their time when they completed the work. Appellant billed by student name and number of hours, whereas the other instructor billed out the number of hours. Under appellant's system of billing, the double billing could be easily detected, while the validity of the other instructor's billing would be difficult to determine. Appellant entered the fact that the student had six hours of behind-the-wheel training on the student's permanent accumulative record so that anyone reading it would know the student had the required training. The permanent records were kept in the school vault, accessible to appellant as acting superintendent, the school bookkeepers, and the secretaries.

The double billing over the last three years amounted to 42 hours, or $210. Some of the billings were as close as three months apart. Appellant admitted that some double billing occurred. He repeatedly denied, however, that the double billing was intentional. He trained approximately 40 to 45 students per year, usually seven or eight students at any given period of time. The lessons were typically given over a span of three or four months, but could span as long as a year, as, for example, when the parents wanted the child to wait. Out of

every five students there would be one or two who would need more than six hours of instruction, so appellant would give them extra hours until he felt comfortable that the student could handle the car properly. He seldom billed for these extra hours given to some students. It was his testimony that he did not indicate the extra hours on the child's permanent record because only six hours were required by the state and he did not want to embarrass the poorer students. He would often give an extra lesson or two either before or after the student had completed his six hours so that the student could practice just before he took his driving test.

The appellant would usually bill for the student's six hours when he completed the work, but sometimes, when the student wanted to wait until just before his driver's test to finish his training, appellant would wait and bill after the student passed the test. The double billing occurred, according to the appellant, because he did not have a clear policy as to whether he should bill after the students completed the six hours or at the time they took the test. This problem was exacerbated by the fact that appellant's recordkeeping, in the last year especially, was by his own admission "shabby." He used informal notes to keep track of students' hours of training, but in the last year his records were primarily in his head because he said he had too many other responsibilities. He said he billed according to name because he knew he might make a mistake and that he knew the board's records were periodically audited. In July 1977, he gave to a student to give to the auditor a list of students for whom he had not charged, in order to compensate for those he may have billed twice. Appellant testified that in the last two or three years he had put in approximately 117 hours for which he did not bill or get paid, totaling approximately $580.

Appellant testified that he never gave a student a certificate of completion before he or she had completed the six hours, except in an isolated case where he had called the examiner to discover that the student

could not get an appointment for a road test for several weeks. In that case, since he knew that by that time the student would have completed the six hours, he signed the certificate so the student could make the appointment for the test. He had authority to withdraw the certificate at any time by notifying the Public Safety Commission. Otherwise, appellant testified, at any time that he signed a certificate of completion for a student, he was convinced in his own mind that the student had received the required six hours of actual behind-the-wheel experience. He further testified that if in fact he ever gave a student less than six hours, he did not know it. Two students, Julie Yoney and Debbie Halvorson, testified that they were given a certificate of completion before they had completed six hours. Neither brought that to the appellant's attention at the time.

When questioned by the school board at a meeting in May 1978, appellant said that double billing was possible, but denied intentionally doing it. He told the board that he had been under so much pressure during the last year that he was physically and mentally exhausted. He said that if indeed he had overcharged some students, he could submit to the board a list of students for whom he had not yet charged, to compensate the district. This list he found and gave to two school board members. Appellant also said it was possible that he had certified a student without giving him the full six hours. Two members of the board testified that appellant told them that possibly some students got less than six hours and some got more, so it all evened out. Appellant denied making this statement to the board. The two board members testified that appellant admitted he may have shortchanged the state or insurance companies, but appellant did not recall making that statement. The board members also testified that they got the impression from appellant's comments at the meeting that he had been including in the students' six hours the time spent by the appellant driving out to pick up students or drop them off. Appellant denied that any of this time was included in the students' six hours, and

all of the students testifying agreed that their driver's training time did not include observation time or time before or after the student took the wheel. On these facts the board concluded that the appellant was guilty of immoral conduct and conduct unbecoming a principal and ordered his discharge.

1. A school board's decision to terminate a teacher or principal should be set aside only if the decision is fraudulent, arbitrary, unreasonable, not supported by substantial evidence on the record, not within the school board's jurisdiction, or is based on an erroneous theory of law. *State ex rel. Lucas v. Board of Educ. of Ind. School Dist. No. 99*, 277 N.W.2d 524 (Minn. 1979); *State ex rel. Ging v. Board of Educ.*, 213 Minn. 550, 7 N.W.2d 544 (1942), *overruled on other grounds, Foesch v. Ind. School Dist. No. 646*, 300 Minn. 478, 223 N.W.2d 371 (1974). To determine whether the board's findings are supported by substantial evidence, a view of the entire record is required, since evidence which might be conclusive if unexplained may lose all probative force when supplemented and explained by other testimony. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951). This court cannot uphold the decision merely on the basis of evidence which in and of itself justifies it without taking into account contradictory evidence or evidence from which conflicting inferences can be drawn. *Id.*

Our review of the entire record convinces us that the school board's finding that appellant intentionally billed for several students twice is unsupported by substantial evidence. Intent is a subjective state of mind usually established by reasonable inference from surrounding circumstances. *State v. Schweppe*, 306 Minn. 395, 401, 237 N.W.2d 609, 614 (1975). Lack of intent to steal is shown by the fact that appellant used names instead of numbers in billing, a procedure which made any error easily ascertainable. There is evidence that he taught many hours for which he did not

bill. Appellant was aware that the school records were periodically audited, and in fact in the summer of 1977 submitted a list of names to the auditor, suggesting there may have been some inaccuracies in the billing. Moreover, the evidence was clear that appellant was extremely busy. There is proof that appellant was a sloppy bookkeeper, but not substantial evidence that he stole the money received as a result of the double billing.

Nor does substantial evidence in the entire record support the fraudulent certification charge. Two students testified that they had received less than six hours of driver's training three years earlier. If this is true, it was not called to anyone's attention until appellant's hearing.

The record as a whole indicates that appellant intended to bill for six hours for every student, despite the fact that he spent more than six hours with many of them, and that he never certified that students had received six hours of training unless he believed that they had received it, or in an isolated case, would have received it by the time they took the test. The evidence does not present a picture of a man greedy for money and intent on stealing from the district. While the school board's findings are entitled to respect, they must be reversed when unsupported by substantial evidence in the record.

2. Because of our disposition of the case, we need not discuss appellant's due process objections. We feel compelled, however, to advise school boards not following the procedure that it is wise to employ a hearing examiner to preside over proceedings for termination or discharge under Minn. Stat. § 125.12. This is particularly true where, as here, two members of the school board testified as witnesses and one board member acted as judge. Such a proceeding may well lack fundamental fairness. *See Hardy v. Ind. School Dist. No. 694*, 301 Minn. 373, 223 N.W.2d 124 (1974).

Reversed and remanded to the district court for proceedings consistent with this opinion.