**CONTINENTAL CAN COMPANY, INC., et al., Petitioners, Respondents,**

v.

**STATE of Minnesota, by William Wilson, Commissioner, and his Successor, Marilyn E. McClure, Commissioner, Department of Human Rights, Appellant.**

**No. 49988.**

Supreme Court of Minnesota.

July 3, 1980.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., and Allen E. Giles, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Broeker, Hartfeldt, Hedges & Grant, Steven R. Hedges, and Barbara J. Blumer, Minneapolis, for respondents.

Phyllis N. Segal and Susan K. Blumenthal, Sue Ellen Dodell, New York City, for Working Women's Inst. & NOW Legal Defense and Education Fund.

Jeffrey A. Hassan, St. Paul, for Charging Party.

KELLY, Justice.

The Department of Human Rights (Department) appeals from the decision of the district court reversing the hearing examiner's decision that Willie Ruth Hawkins' employer, Continental Can Co. (Continental), discriminated against her on the basis of sex with respect to her conditions of employment.

Judicial review of the decision of the Department of Human Rights is governed by Minn.Stat. § 15.0425 (1978), the Minnesota Administrative Procedure Act.

We must determine whether the hearing examiner's findings are supported by substantial evidence and whether his decision that Continental committed unfair discriminatory practices against Willie Ruth Hawkins in violation of Minn.Stat. 363.03, subd. 1(2)(c) (1978) is unaffected by errors of law. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 827 (Minn.1977).[1]

---

1. Although this court has adopted an interpretation of the substantial evidence rule which pays no particular deference to the decision of the district court and which rejects the "clearly erroneous" interpretation of that rule, *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 823–24 (Minn.1977), we have also held that a review-ing court must examine all the evidence and cannot uphold a decision based on evidence which standing alone is conclusive but which loses all probative force when supplemented or explained by other evidence. *Liffrig v. Ind. School Dist. No. 442, Oslo, Minnesota,* 292 N.W.2d 726 (Minn.1980). We note that there

The record reveals the following facts. Willie Ruth Hawkins, a black female, began her employment at Continental in December 1974. Throughout the duration of her employment, Continental employed only one other female, Debra Waits, at the Eagan plant.

Three male Continental employees, Tom Warling, Cliff Warling, and Bucky Kiesling, repeatedly made explicit sexually derogatory remarks and verbal sexual advances to Hawkins and Waits between December 1974 and March 1975. Hawkins testified that Cliff Warling also frequently patted her on the posterior. Cliff Warling admitted that on one occasion Hawkins told him she objected to the patting. In March 1975, the women complained to their supervisor, Jim Surface, about the remarks. However, they refused to identify their harassers. Continental took no action in response to the complaints.

Hawkins testified that the offensive remarks and touching continued after March 1975. However, based on Continental's lack of response to her first complaint, she felt she had to endure this treatment and made no further complaints until October 13, 1975.

On October 13, 1975, Hawkins worked at a machine called a "double seamer." She bent over it and sorted cans. Cliff Warling approached her from behind and grabbed her between the legs. She complained immediately to Jack French, the plant manager. Continental took no immediate action in response to this complaint.

Hawkins returned to work without further incident on October 13, 14, and 15, 1975. On the afternoon of October 16, Bobby Hawkins, Willie Ruth Hawkins' husband, confronted Cliff Warling in Continental's parking lot about the grabbing incident of October 13. Bobby Hawkins testified that Warling admitted that the incident occurred and apologized. Cliff Warling testified that he denied the incident but that he apologized about the patting incidents. Bobby Hawkins left the plant but returned around midnight to escort his wife home. They discovered that her car's headlights were broken. The next morning, on October 17, Jack French verbally reprimanded Cliff Warling about the parking lot confrontation. Warling then called his wife who told him she was concerned about a car which drove slowly past the Warling home. Warling left the plant. Rod Stevenson, a supervisor, observed him removing a gun from the gun rack in his pickup. Understandably, French was concerned and went to the police. The police then informed French that the Hawkins had filed a complaint that morning against Scott Losie, another Continental employee.

The complaint filed by the Hawkins arose from incidents occurring on the morning of October 17. That day, Pamela Losie received a threatening phone call from a person she believed to be a black female. She called her husband, Scott Losie, at work. He left work and drove to the Hawkins' home and threatened Willie Ruth Hawkins with a gun in the presence of her children. Later, he called his supervisor, Rod Stevenson, and told him he waved the gun at Ms. Hawkins. Stevenson told Losie to return to work. Losie was arrested at Continental later that day and charged with aggravated assault.

A series of meetings between the Hawkins couple and representatives of Continental took place between October 17 and October 27. Continental's representatives asked Hawkins to return to work on several occasions. She refused because the company made no assurances for her safety. On October 22, Cliff Warling and Scott Losie were suspended for 6 weeks after repre-

---

are other interpretations of the same rule in which agency findings are reversed where it appears they are clearly against the weight of the evidence or where the reviewing court is left with a definite and firm conviction a mistake has been made. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed.

456 (1951); *Benedict v. Board of Police Pension Fund Commrs.*, 35 Wash.2d 465, 214 P.2d 171 (1950); *Burke v. Coleman*, 356 Mo. 594, 202 S.W.2d 809 (1947).

Under any interpretation of the substantial evidence rule, the result in this case is the same.

sentatives of Continental met with representatives of the New Way Community Center and the Urban League who threatened boycotts and adverse publicity if Continental did not take action. Continental did not initiate a formal investigation until October 29, 1975. They held a plant meeting on November 6, 1975, during which they informed their employees that Continental would not tolerate verbal or physical sexual harassment and discrimination. Willie Ruth Hawkins did not return to work after October 16. Continental terminated her employment on December 5, 1975.

Hawkins filed a charge with the Department on October 20, 1975. She alleged that Continental and Jack French, the plant manager discriminated against her on the basis of her sex with respect to her conditions of employment in violation of Minn. Stat. § 363.03, subd. 1(2)(c) (1978). The Department found probable cause to believe that a violation of the Minnesota Human Rights Act (Act) occurred and on February 16, 1977, filed a complaint against Continental and French. After a hearing, the hearing examiner concluded that Continental committed two unfair discriminatory employment practices in violation of Minn. Stat. § 363.03, subd. 1(2)(c) (1978) and that Hawkins was constructively discharged as a result of Continental's violations. He awarded her back pay damages but reduced those damages because he determined that her husband's activities at Continental and racial discrimination contributed to the tension at the plant. He denied punitive damages and reinstatement. He ordered Continental to cease and desist from discrimination against any person because of sex in the conditions of employment. He also concluded that French did not violate Minn. Stat. § 363.03, subd. 6 (1978) by intentionally aiding and abetting Continental in a violation of the Act. This last finding was not appealed to the district court or to this court.

Continental appealed the hearing examiner's decision to the district court pursuant to Minn.Stat. §§ 15.0424 and 363.072 (1978). The Department filed a cross-petition and Willie Ruth Hawkins intervened with permission of Continental and the Department. The district court reversed the hearing examiner's decision and dismissed the complaint with prejudice. The Department appeals the district court's decision pursuant to Minn.Stat. § 363.10 (1978). Hawkins filed an amicus brief with permission of this Court.

The following issues are presented for this Court's determination:

1. Whether substantial evidence supports the hearing examiner's findings that co-employees subjected Hawkins to repeated acts of verbal and physical sexual harassment, that Hawkins notified Continental of this harassment on two occasions, and that Continental failed to act promptly in response to these complaints.

2. Whether verbal and physical sexual harassment directed at an employee by fellow employees may, under certain circumstances, constitute sex discrimination in the conditions of employment. If so, what duty does the Act impose on an employer in these circumstances?

3. Whether Continental committed unfair discriminatory employment practices in violation of Minn.Stat. § 363.03, subd. 1(2)(c) (1978).

4. Whether the hearing examiner's finding that Continental's unfair discriminatory practices constructively discharged Willie Ruth Hawkins is supported by substantial evidence.

5. Whether the issue raised concerning the award of damages is properly before us.

■ 1. The hearing examiner found that commencing in February 1975, Hawkins' co-workers, Cliff Warling, Tom Warling and Bucky Kiesling, repeatedly made verbal sexual advances to Hawkins. He found that they told her how they could make her feel sexually and that based on their sexual prowess, Hawkins would want to leave her husband. He also found that those same individuals repeatedly directed sexually derogatory remarks at Hawkins. These remarks included Cliff Warling's references to the movie *Mandingo*. He told

Hawkins that he wished slavery days would return so that he could sexually train her and she would be his bitch. The hearing examiner found that she reported these incidents, without identifying the source of the remarks, to her supervisor, Jim Surface, in March 1975. He found that Surface informed Hawkins that there was nothing he could do and that she had to expect that kind of behavior when working with men. He found that Continental took no action whatsoever in response to Hawkins' complaint. He found that after March 1975, Cliff Warling patted Hawkins on the posterior on numerous occasions. He found that Tom and Cliff Warling and Bucky Kiesling informed Hawkins that women who worked at factories were tramps. He found that Cliff Warling grabbed Hawkins between the legs on October 13, 1975, and that she reported the incident to French the same day. Finally, he found that Continental did not conduct an investigation into the matter or take any other action with respect to this incident until after the events of October 16 and 17, 1975.

In making these findings, the hearing examiner credited Hawkins' and Waits' testimony over the testimony of Continental supervisors and staff.

The district court found that substantial evidence supported the hearing examiner's findings regarding the sexually derogatory remarks, verbal sexual advances, the patting and grabbing incidents as well as the findings of notice to Continental. However, he disagreed in part with the findings of inaction by Continental. In so doing, he credited the testimony of Surface over that of Hawkins and Waits.

The evidence preponderates in favor of the hearing examiner's findings on this issue. Both Hawkins and Waits testified that Surface informed them that they must expect that kind of behavior when working with men. Only Surface testified to the contrary.

After a thorough review of the entire record, we conclude that the hearing examiner's findings regarding the sexually derogatory remarks, the verbal sexual advances, notice to Continental, and inaction by Continental in March and October 1975 are supported by overwhelming evidence.

2. We must determine whether verbal and physical sexual harassment directed at an employee by fellow employees may, under certain circumstances, constitute sex discrimination in the conditions of employment.

The Minnesota Human Rights Act (Act) prohibits sex discrimination in the conditions of employment. Minn.Stat. § 363.03, subd. 1 (1978) provides in part:

> Except when based on a bona fide occupational qualification, it is an unfair employment practice: * * * (2) for an employer because of * * * sex * * * (c) to discriminate against a person with respect to his hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

This is a case of first impression under the Act. Principles developed in Title VII cases [2] by federal courts are instructive and have been applied by this Court when construing the Minnesota Act. *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978).

The majority of federal courts which have faced the issue have held that sexual harassment can constitute actionable sex discrimination. However, these cases, to some extent, are factually distinguishable. The facts in these cases generally involve the following. A female employee is approached by a male supervisor or manager with demands for sexual favors. When she refuses, she is fired, demoted, or her job is abolished. To state a cognizable claim under Title VII in this setting, the plaintiff must allege that the acts complained of became terms or conditions of her employ-

**2.** 42 U.S.C.A. § 2000e-2(a)(1) (West 1974) (Title VII) provides in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex * * *.

ment and that these terms or conditions were imposed on account of her sex. In other words, the plaintiff must allege a nexus between the acts complained of and her employment and that her status as a female was a motivating factor behind the imposition of the condition. *Tomkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977); *Barnes v. Costle*, 561 F.2d 983 (D.C. Cir. 1977); *Heelan v. Johns-Manville Corp.*, 451 F.Supp. 1382, 1389 (D.Colo.1978); *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459 (E.D.Mich.1977); *Bell v. St. Regis Paper Co.*, 425 F.Supp. 1126 (N.D.Ohio, 1976); *Williams v. Saxbe*, 413 F.Supp. 654 (D.D.C.1976), *rev'd sub nom. on other grounds Williams v. Bell*, 587 F.2d 1240 (D.C. Cir. 1978).

These same courts are not in complete agreement on the theory by which an employer is to be held liable for the acts of supervisory personnel. The courts take different approaches which range from requiring some variety of notice to the employer and a failure to take remedial action to automatic and vicarious liability. For instance, in *Tomkins v. Public Service & Gas Co.*, 568 F.2d at 1048–49, the court stated:

" * * * Title VII is violated when a supervisor, with the *actual or constructive knowledge* of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee's job status—evaluation, continued employment, promotion, or other aspects of career development—on a favorable response to those advances or demands, and the employer does not take *prompt and appropriate remedial action* after acquiring such knowledge." (Emphasis supplied.)

In a similar vein, the court in *Barnes v. Costle*, 561 F.2d at 993, held:

"Generally speaking, an employer is chargeable with Title VII violations occasioned by discriminatory practices of supervisory personnel. We realize that should a supervisor contravene employer

policy without the employer's knowledge and the *consequences are rectified when discovered*, the employer may be relieved from responsibility under Title VII." (Footnotes omitted.) (Emphasis supplied.) [3]

However, in *Munford v. James T. Barnes & Co.*, 441 F.Supp. at 466, the court said: "[A]n employer may be liable for the discriminatory acts of its agents or supervisory personnel if it *fails to investigate complaints of such discrimination.* The failure to investigate gives tacit support to the discrimination because the absence of sanctions encourages abusive behavior. While the Court declines to follow the holding in *Barnes* that an employer is automatically and vicariously liable for all discriminatory acts of its agents or supervisors, the Court does hold that *an employer has an affirmative duty to investigate complaints of sexual harassment and deal appropriately with the offending personnel.*" (Emphasis supplied.)

Finally, in *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir. 1979), the court " * * * conclud[ed] that respondeat superior does apply here, where the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy." (Emphasis supplied.)

Racial harassment cases are factually more similar to the case at bar than most existing sexual harassment cases. For example, in *Friend v. Leidinger*, 446 F.Supp. 361 (E.D.Va.1977), *aff'd*, 588 F.2d 61 (4th Cir. 1978), the court recognized a cause of action under Title VII against an employer for racial harassment of the plaintiff by co-employees, but held that an employer may be held liable only where the employer knows or should know of the condition and permits it to continue without attempting to "discourage" it. "I say 'discourage' be-

---

**3.** *See also Barnes v. Costle*, 561 F.2d at 995-1001 (MacKinnon, Circuit Judge, concurring) in which the eminent jurist Judge MacKinnon offers a well-reasoned, albeit more restrictive, approach, to employers' vicarious liability in Title VII sexual harassment cases.

cause it is clear that there will always be bigots, both black and white, and we will never have a social system free of the effects of bigotry." 446 F.Supp. at 384. The court held that the employer did not violate Title VII because defendants demonstrated "that they have striven to reduce racial tension and correct instances of unfairness related to race. Defendants cannot be faulted for failing to create a perfect world." *Id.* at 382.

Another example of an employer response which was sufficient to escape liability under Title VII may be seen in *Howard v. National Cash Register Co.*, 388 F.Supp. 603 (S.D.Ohio 1975). The plaintiff alleged that he had been subjected to racial harassment by his co-employees. The employer was not liable because in response to plaintiff's complaints, management transferred him to another shift, held frequent meetings with him and the head of his department, disseminated the company's anti-harassment policy to all employees, and took disciplinary action against the harassers.

The Equal Employment Opportunity Commission recently promulgated interim guidelines on sex discrimination in the form of sexual harassment. These guidelines provide that harassment on the basis of sex constitutes a violation of 42 U.S.C. § 2000e–2. The guidelines characterize "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" as sexual harassment when

(1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work perform-

ance or creating an intimidating, hostile, or offensive working environment.

45 Fed.Reg. 25025 (1980) (to be codified in 29 C.F.R. § 1604.11(a)). Under the interim guidelines, responsibility is imposed on an employer for its own acts and those of its agents and supervisory employees on a respondeat superior theory of liability. *Id.* (to be codified in 29 C.F.R. § 1604.11(c)). Where co-employees are the source of sexual harassment in the workplace, the employer is liable only where it "knows or should have known of the conduct. An employer may rebut apparent liability for such acts by showing that it took immediate and appropriate corrective action." *Id.* (to be codified in 29 C.F.R. § 1605.11(d)).

■ The provisions of the Minnesota Human Rights Act are liberally construed to accomplish its purposes. *City of Minneapolis v. Richardson*, 307 Minn. 80, 89, 239 N.W.2d 197, 203 (1976). One of the purposes of the Act is to rid the workplace of disparate treatment of female employees merely because they are female. Differential treatment on the basis of sex is more readily recognizable when promotion or retention of employment is conditioned on dispensation of sexual favors.[4] It is as invidious, although less recognizable, when employment is conditioned either explicitly or impliedly on adapting to a workplace in which repeated unwelcome sexually derogatory remarks and sexually motivated physical contact are directed at an employee because she is a female. Repeated, unwarranted and unwelcome verbal and physical conduct of a sexual nature, requests for sexual favors and sexually derogatory remarks clearly may impact on the conditions of employment. When sexual harassment is directed at female employees because of their womanhood, female employees are faced with a working environment different from the working environment faced by male employees.

---

4. When promotion or retention of employment is conditioned on dispensation of sexual favors, we note that the applicable statutory language of prohibition would appear to be "[I]t is an unfair employment practice: * * * (2) For an employer, because of * * * sex * *

(b) to discharge an employee; * * * or (c) to discriminate against an employee with respect to his hire, tenure, compensation, [or] upgrading * * * of employment." Minn. Stat. § 363.03, subd. 1(2)(b) and (c) (1978).

■ We hold that the prohibition against sex discrimination in Minn.Stat. § 363.03, subd. 1(2)(c) (1978) includes sexual harassment which impacts on the conditions of employment when the employer knew or should have known of the employees' conduct alleged to constitute sexual harassment and fails to take timely and appropriate action.[5] To determine whether actionable sex discrimination exists in a given case, all the circumstances surrounding the conduct alleged to constitute sexual harassment, such as the nature of the incidents and the context in which they occurred, should be examined. In addition, the facts alleged to constitute notice to the employer of the employee's conduct as well as the circumstances surrounding those facts should be considered. Finally, the timeliness and appropriateness of the employer's response, if any, to the conduct complained of should be examined.

One further legal issue must be addressed. The hearing examiner held that the Act imposes a duty on an employer to maintain a working environment free from discriminatory insults, intimidation and harassment. The district court reversed, holding that the Act imposes a duty on the employer to make an effort to control the harassment of which it has knowledge.

■ In our view, the Act does not impose a duty on the employer to maintain a pristine working environment. Rather, it imposes a duty on the employer to take prompt and appropriate action when it knows or should know of co-employees' conduct in the workplace amounting to sexual harassment. To the extent the conclusions of law of the hearing examiner and the district court are inconsistent with this view, they are reversed.

■ 3. In our view, verbal and physical sexual harassment includes sexually motivated physical contacts, sexually derogatory statements and verbal sexual advances. Our independent review of the record convinces us that the remarks which Hawkins complained about to Surface in March 1975 amounted to verbal sexual harassment. We are also convinced that the grabbing incident amounted to physical sexual harassment.

■ This resolved, we turn to the issue of whether Continental committed unfair employment practices in violation of Minn. Stat. § 363.03, subd. 1(2)(c) (1978). The hearing examiner found that Continental committed unfair employment practices by discriminating against Hawkins in her condition of employment on the basis of her sex during two distinct time frames. In his view, the first occurred when Hawkins notified Continental of the sexually derogatory statements by co-workers in March 1975 through October 13, 1975. The second occurred after she notified Continental of the grabbing incident on October 13, 1975 through October 15, 1975. The district court constructed its own time frames. The court held that there was not substantial evidence supporting a finding of an unfair employment practice between March 1975 and October 12, 1975. He then held there was not substantial evidence to support such a finding between October 13, 1975 and November 6, 1975.

The hearing examiner concluded that Continental violated the Act between March through October 13, 1975 because despite the fact that Hawkins notified Continental of the sexual harassment, Continental did not investigate the incidents or take any affirmative action to curtail further similar occurrences. He stated:

"* * * [I]f [Continental] would have taken affirmative action at the initial report the further sexual [physical] advances [the patting of Hawkins' posterior], sexually derogatory statements and the incident of October 13, 1975 would not have occurred. Therefore, [Continental] because of sex discriminated against [Hawkins] with respect to her conditions of employment."

---

5. It is unnecessary in this case to decide what theory of liability is appropriate when the employer's agents and supervisors are the source of conduct alleged to constitute sexual harassment.

In contrast, the district court concluded that it was

" * * * difficult to imagine what type of investigation could be conducted when the names of co-workers were not given to Jim Surface."

The court held that the hearing examiner's finding of sex discrimination resulting from events prior to October 13, 1979 was not supported by substantial evidence.

We appreciate the fact that without the harassers' identities, Continental's options were limited. However, Continental took no action whatsoever. Even without the harassers' identities, Continental could have disseminated an anti-harassment policy to its employees as did the employer in *Bell v. St. Regis Paper Co.*, 425 F.Supp. 1126 (N.D. Ohio 1976) when faced with complaints about unidentified harassers.

The sexually derogatory statements and verbal sexual advances [6] were directed at Hawkins because she is a woman. These incidents impacted on the conditions of her employment. We conclude that by failing to take any action whatsoever in response to her complaints in March 1975, Continental committed an unfair employment practice by discriminating against Hawkins in the conditions of employment on the basis of sex.

The hearing examiner concluded that Continental committed a second unfair employment practice after Hawkins notified French of the grabbing incident on October 13, 1975 because Continental did not conduct an *immediate* investigation into the matter and did not promptly attempt to prevent further reoccurrences of the same conduct. He did not make factual findings as regards actions taken by Continental after October 17, 1975.

The district court held that this conclusion was not supported by substantial evidence. In so doing it made supplemental findings of fact instead of confining itself to a review of the hearing examiner's decision. These supplemental findings concerned meetings held by Continental on Oc-

tober 17, 22, and 27, 1975; the suspension of Losie and Warling on October 22, 1975, the initiation of a formal investigation on October 29, 1975, and the meeting held by Continental in which it disseminated its anti-harassment policy to its employees. The district court held that the hearing examiner's conclusion that Continental did not take effective action to curtail other similar conduct on the part of Willie Ruth Hawkins' co-workers was not supported by substantial evidence because "[a] review of the record shows that the company did take action with regard to the grabbing after the headlights and the gun incident."

The issue facing this court is at what point Continental's duty to act was activated—before or after the parking lot and gun confrontations. The hearing examiner held, in effect, that Continental had a duty to act the same day Hawkins notified French of the grabbing incident or promptly thereafter. The gist of the second violation of the Act, then, was Continental's failure to act promptly. The district court disagreed. It found that Continental acted in a timely fashion even though it took no action until after the parking lot and gun confrontations.

We believe that Continental had a duty to act on October 13, 1975. It did not conduct an investigation until after the situation escalated into violent confrontation. Continental did not suspend Losie and Warling until after a meeting with the Hawkins and others who threatened adverse publicity and boycotts. It did not disseminate an anti-harassment policy to its employees until November 6, 1975. As stated earlier, there is substantial evidence that Continental took absolutely no action on October 13, 14 or 15, 1975. The essence of the second unfair discriminatory practice lies not in the inadequacy of Continental's later responses to the situation but instead in the fact that these responses were not timely. This failure to respond promptly to Hawkins' complaints regarding the grabbing incident "connected" Continental to the act of sexual harassment perpetrated by its employee

6. *See* part 1 of this opinion.

on October 13, 1975. The "grabbing" incident constituted sexual harassment which impacted on Hawkins' employment conditions. Therefore, we affirm the hearing examiner's conclusion that Continental committed a second unfair discriminatory practice by discriminating against Hawkins in the conditions of employment on the basis of sex.

■ 4. A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination. *Danz v. Jones*, 263 N.W.2d 395, 402 n. 4 (Minn.1978). *See also Young v. Southwestern Savings and Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975).

■ The hearing examiner found that Continental's unfair employment practices caused intolerable working conditions which led to Hawkins' decision to resign from her employment at Continental. The hearing examiner reasonably inferred that Continental's failure to take prompt and appropriate action after Hawkins notified them of the October 13, 1975 grabbing incident substantially contributed to the working conditions and relations at the plant under which Hawkins felt she could not safely work. She testified that after her headlights were broken in Continental's parking lot on October 16, 1975, and after Losie threatened her with a gun on October 17, 1975, she no longer felt she could work safely at Continental. It was at that point and for those reasons she decided to terminate her employment. The hearing examiner's finding that Continental's unfair unemployment practices constructively discharged Hawkins is supported by substantial evidence.

■ 5. Upon finding of unfair discriminatory employment practice, the hearing examiner is empowered by Minn.Stat. § 363.071, subd. 2 (1978) to award compensatory and punitive damages to the aggrieved employee. The award of damages is committed to the hearing examiner's sound discretion and may be modified only if arbitrary and capricious or if unsupported by substantial evidence on the record as a whole. *Dakota County Abstract Co. v. Richardson*, 312 Minn. 353, 356, 252 N.W.2d 124, 126 (1977).

In this case the hearing examiner denied Hawkins' request for $500 in punitive damages on the ground that Continental did not *intentionally* discriminate against Hawkins. Neither the Department nor Hawkins appeals from the denial of punitive damages. The hearing examiner awarded Hawkins $5,000 in back pay as an item of compensatory damages. After deducting the amount of unemployment compensation and wages actually earned by Hawkins from the amount of wages she would have earned at Continental during the relevant time period, the hearing examiner arrived at a figure of $9,867.46. He then reduced these back pay damages to $5,000 and denied reinstatement on the ground that the actions of Bobby Hawkins on October 17, 1975 in Continental's parking lot and the elements of racial discrimination present in the Losie incident on October 17, 1975 added to the tensions and hostilities at Continental.

■ The Department appeals the issue of the reduction of back pay damages. However, the reduction of compensatory damages was not arbitrary and capricious and was supported by substantial evidence on the record as a whole.

The district court's decision is reversed and it is ordered that judgment be entered as follows:

1. Respondent, Continental Can Company, Inc. shall cease and desist from discriminating against any person because of sex with respect to said person's conditions of employment.

2. Continental Can Co., Inc. shall take prompt and appropriate action when it knows or should know of conduct in the workplace amounting to sexual harassment.

3. Willie Ruth Hawkins shall not be awarded punitive damages.

4. Willie Ruth Hawkins shall not be awarded compensatory damages other than back wages.

5. Willie Ruth Hawkins shall not be reinstated in her former position with Respondent, Continental Can Company, Inc., with seniority and upgrading plus benefits.

6. Respondent, Continental Can Company, Inc. shall pay to Willie Ruth Hawkins an amount equal to $5,000 as damages and loss of back wages.

Opinion filed June 6, 1980 in the above case is withdrawn and the foregoing opinion substituted in its stead.