**MINNEAPOLIS POLICE DEPARTMENT,**
Respondent,

v.

**MINNEAPOLIS COMMISSION ON CIVIL RIGHTS, Respondent,**

Diane Sterling, Petitioner, Appellant.

No. C5–86–1061.

Supreme Court of Minnesota.

June 17, 1988.

Robert J. Brenner, Minneapolis, for appellant.

Robert J. Alfton, City Atty., Scott Reeves, Asst. City Atty., Minneapolis, for Minneapolis Police Dept.

Nancy Zalusky Berg, Minneapolis, for Com'n on Civil Rights.

WAHL, Justice.

Diane Sterling appeals the decision of the court of appeals which reversed the decision of a three-member panel of the Minneapolis Commission on Civil Rights (MCCR) holding the Minneapolis Police Department

(MPD) liable to Sterling for employment discrimination based on race. MCCR, joining in the appeal, asks this court to review the court of appeals' recommendation that the MCCR appoint independent hearing examiners to preside over contested hearings. We do not find that the appointment of an independent hearing examiner was necessary in the present case. Otherwise, we affirm the court of appeals.

The facts developed in the record, are as follows:

Diane Sterling is a white female who began work in the transcription unit of the Minneapolis Police Department in July 1981. The transcription unit provides general clerical support to the police department and is staffed 24 hours per day. The clerks are divided among three shifts, A, B and C, and each shift is rotated on a monthly basis to a different eight-hour period. There is no difference among shifts in the hours worked, pay rate, status, work load or job duties.

Kathy Scott, also a white female, worked in the transcription unit on the "B" shift with Sterling. Scott was not a supervisor; she and Sterling held the same job classification. Both were supervised by Steven Soucy.

The record shows evidence of personal conflicts between Sterling and Scott as early as August 1981. On August 31, 1981 Sterling sent Soucy a memo complaining generally about Scott's profanity and bossiness, but later asked Soucy to not take any action. In October 1981, Sterling requested a transfer because of Scott's verbal abuse but the request was denied. However, prior to March 12, 1982, Sterling made no mention of racial comments and/or discrimination from Scott or any other police personnel.

The incident which is the focus of her discrimination complaint occurred on March 10, 1982. That evening, she participated in a "ride-along" program with a minority police officer. Upon returning to the station they passed the transcription room and heard Scott yelling words to the effect of "bitch or witch or gray witch * * * *." Sue Hilde, a co-worker, later informed Sterling that Scott had said "that f—ing broad, that gray bitch. It makes me sick. Nigger lover. Gray lady." Sterling was told by co-workers that "gray lady" is a slang term meaning a white woman who has black friends.

On March 12, 1982, Sterling made a written complaint regarding the incident and also accused Scott of repeatedly making racist remarks and refusing to perform assigned duties for minority officers. Because Soucy was not in his office, she took the letter directly to his supervisor, Lt. Donaldson, who walked her to Chief Bouza's office where she repeated her complaint. Chief Bouza directed the Internal Affairs Unit of the MPD to make an investigation.

Soucy sent a letter to Scott advising her of the seriousness of the incident and asking her to respond to the allegations. He and Donaldson met with Scott the following Monday at which time she flatly denied the accusations. At the same time, Internal Affairs took statements from Hilde, Soucy, Scott, and Sterling, but turned the matter back to the division for internal resolution because they were unable to corroborate the allegations. On April 8, 1982, Soucy sent a letter to both Scott and Sterling informing them that there was insufficient evidence to pursue the matter.

Dissatisfied with this result, Sterling filed a complaint with the Minneapolis Affirmative Action Office the same day. When Larry Blackwell, the affirmative action officer, intervened, MPD reopened its investigation.

Deputy Police Chief Patrick J. Farrell directed the Internal Affairs Unit to interview a number of officers named by Sterling as personnel for whom Scott had refused to work. Two of the seven interviewed officers (both minorities) indicated that they experienced difficulties in getting Scott to work for them.

After a hearing, convened by Farrell and attended by both Scott and Sterling on May 4, 1982, Farrell made a written report to Chief Bouza on May 5th in which he stated that "the unsubstantiated allegations made

by Diane had acquired a degree of credibility because of the information learned from the officers * * *." He recommended that Scott be reprimanded for her racially offensive remarks and attitude toward minorities. He also recommended that Sterling be reprimanded for failing to bring the situation to the attention of a supervisor until she herself was made the target of racial comments.

Upon receiving Farrell's recommendations, Chief Bouza ordered a three-day suspension without pay for Scott and exonerated Diane Sterling on May 6, 1982. Neither received reprimands. Consistent with departmental policy for uniformed officers, Scott was permitted to select three consecutive days within a limited period for her suspension. She took her suspension along with a previously scheduled vacation; that is, the days without pay were appended to her vacation time. One of the three days had already been planned as a "leave without pay" day.

In early May, Sterling and Hilde were reassigned to C shift, effective June 1, 1982. Sterling then went on medical leave from mid-July until September 2, 1982. After returning from leave, she was transferred back to B shift, effective October 1, 1982, and continued on that shift throughout her employ by the MPD.

Sterling has atopic dermatitis, a genetic condition, which can be aggravated by work-related stress. Garrett Bayrd, a dermatologist, saw her in January 1982 for treatment of the condition. He testified that her medical history revealed that a flare-up had occurred four to six months before he saw Sterling, and that she associated it with her new job. He saw her for the last time on September 22, 1982, and at that time she reported and showed significant improvement. She sought workers' compensation benefits for "dermatitis of hands and feet caused by stress related to employment" during the summer of 1982. On March 30, 1983, she entered a stipulation of settlement and received an award of $1,966.48.

On May 26, 1982, Sterling filed a complaint of racial discrimination with the Minneapolis Department of Civil Rights, alleging harrassment and reprisal due to her complaint about Scott. She emphasized that her complaint concerned only Kathy Scott and no other employees. The Civil Rights Department referred her complaint to the MCCR. A three-member panel of the MCCR conducted a contested case hearing and concluded that Sterling had established discrimination based on the racially antagonistic attitudes of co-workers and retaliatory actions of the MPD in violation of Minneapolis Civil Rights Ordinances, c. 139, §§ 139.40(b)(3) and 139.40(k)(3).

The court of appeals reversed this decision. It held, pursuant to this court's decision in *Sigurdson v. Isanti County,* 386 N.W.2d 715 (Minn.1986), that commissions, as well as trial courts, must apply, in employment discrimination cases, the analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and adopted by this court. *See Danz v. Jones,* 263 N.W.2d 395 (Minn.1978). The court of appeals determined, however, that Sterling had failed to establish a prima facie case of employment discrimination thus making a remand for application of the analysis unnecessary. The court of appeals also expressed concern that the panel proceeding of the MCCR lacked fundamental fairness because of perceived bias and recommended that the MCCR appoint a hearing examiner to preside over future contested hearings.

Sterling argues in this court that the court of appeals erred in finding that she failed to establish a prima facie case of employment discrimination under the *McDonnell Douglas* analysis. She also argues that, in the absence of an explicit *McDonnell Douglas* analysis, the case must be remanded to the MCCR for application of that analysis. In addition to these issues, we consider whether the MCCR should be required to appoint independent hearing examiners in contested employment discrimination hearings.

## I.

■ We first consider whether the court of appeals erred in finding that Sterling

had failed to establish a prima facie case of employment discrimination under *McDonnell Douglas* analysis. As a threshold matter, we affirm the court of appeals and hold that the *McDonnell Douglas* three-step analysis (prima facie case, answer, rebuttal) must be used, not only by trial courts, but by all triers of fact in all employment discrimination cases involving disparate treatment claims.[1] Such a holding is a logical extension of our holding in *Sigurdson.* Here, as there, "* * * it is important that the basis for the [panel's] decision be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review." *Sigurdson,* 386 N.W.2d at 721.

Minneapolis Code of Ordinances § 141.60(b) provides that judicial review of a final decision in a contested case will be held in accordance with Chapter 14 (Administrative Procedure Act) of Minnesota Statutes. Under § 14.69 of the Act, the reviewing court may affirm, remand, reverse or modify an agency decision if the agency's findings, conclusions or decisions are in error of law, unsupported by substantial evidence or arbitrary or capricious. Minn. Stat. § 14.69(d), (e), (f) (1986). The substantial evidence standard applies generally to agency adjudications. Under this standard, the reviewing court will affirm the agency's decision if, in considering the entire record, it is supported by evidence that a reasonable mind might accept as adequate. *Minnesota Power and Light Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 324, 328 (Minn.1983). After reviewing the entire record, we agree that Sterling has not established a prima facie case.

■ Sterling oversimplifies the plaintiff's burden where a claim of discrimination is being brought against an employer for the discriminatory actions of its employees. She argues that it is necessary only to show evidence creating an inference of unequal treatment in order to establish a prima facie case. *See Bersie v. Zycad Corp.,* 399 N.W.2d 141, 145 (Minn.App. 1987), *citing Danz v. Jones,* 263 N.W.2d at 399–400. However, we have held in order to establish a claim of co-employee harrassment it is necessary to show not only discriminatory treatment but also the employer's failure to take prompt action when it knew or should have known of the co-employee's conduct. *Continental Can Co., Inc. v. State of Minnesota,* 297 N.W.2d 241, 249 (Minn.1980).

In the present case, it is undisputed that no one, including Sterling, complained about Scott's racial behavior or refusal to work for minority officers, or general racial discrimination in the department, before March 10th. Our focus then should center on those events which occurred after March 10, 1982. After Sterling reported the incident, the department undertook an immediate investigation, warned Scott about her allegedly objectionable behavior, ultimately disciplined her, and separated Scott and Sterling. On May 26, 1982, Sterling submitted her discrimination complaint to the Minneapolis Department of Civil Rights. By October of that year, she reported to other managers in the police department and labor relations that things were going quite well.

■ There is little evidence in the record that she apprised her supervisors of co-workers' harrassment after March 10. On April 12, 1982 Sterling sent Soucy a memo

1. The United States Supreme Court has distinguished "disparate treatment" from "disparate impact" cases as follows: Disparate treatment cases involve allegations that an employer treats some people less favorably "because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In such cases, proof of discriminatory motive is critical. "Disparate impact" claims involve facially neutral employment practices that fall more harshly on one group over another. In these cases proof of discriminatory motive is not required. *Id.* at 336 n. 15, 97 S.Ct. at 1854 n. 15. In the present case, Sterling is a white female who was allegedly the focus of a racial slur made by another white female. Her claim is one of disparate treatment based on "race association" discrimination. See *City of Minneapolis v. State by Wilson,* 310 N.W.2d 485, 487 (Minn.1981), where this court determined that discrimination against a person is forbidden not only "because of that person's race, etc. but also because of the race, etc. of another individual * * *" with whom the plaintiff is associated.

reporting that her "work sheet is not very full because the officers that came in went either to Kathy or Judy, not Sue and I." Three days later, she complained generally about Scott's attitude and verbal abuse. There are no other indications in the record that she informed her supervisors of incidents which would constitute the "intimidating, hostile and offensive employment environment" found by the hearing panel. Proof is lacking that the employer failed to take prompt action when it knew of the co-employee's conduct.

 Nor does Sterling establish a prima facie case for reprisal under the framework set forth by this court in *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 444–46 (Minn.1983). In *Hubbard*, we determined that an employee can establish reprisal only by showing "adverse employment action" in response to a lawful activity by the employee. *Id.* at 444. In Sterling's case the hearing panel identified two instances of reprisal: Sterling's shift transfer and Deputy Chief Farrell's recommended reprimand. Neither represented an employment practice that in effect was adverse to Sterling. Soucy testified that his decision to transfer Sterling and Hilde rather than Scott was an attempt to balance experience and seniority. There was no difference among shifts in wages, benefits, workload or duties. Regarding Farrell's reprimand, that recommendation was rejected by Chief Bouza one day after it was made.

 The evidence in the present case fails to establish that Sterling was discriminated against in her employment on the basis of race. The solitary incident occurring on March 10 must be put into the proper context. The record indicates that Scott and Sterling did not get along from the beginning of Sterling's assignment to the transcription unit. Not only had Sterling complained very early about Scott's profanity and bossiness, she also requested a transfer. Her doctor testified that, long before March 10, she was physically reacting to job tensions, assumedly resulting from relationship problems with Scott. Soucy could have understandably perceived the March 10th incident as further evidence of continued friction between co-workers. On the record before us, we hold that Sterling has failed to establish a prima facie case of employment discrimination based on race against her employer, the Minneapolis Police Department. Because the threshold requirement of the *McDonnell Douglas* analysis, a prima facie case, has not been satisfied, remand for completion of the analysis is unnecessary.

## II.

Finally we consider whether the MCCR should be required to appoint independent hearing examiners in contested employment discrimination hearings. The special legislation which enabled the establishment of the Minneapolis civil rights' agency, provides:

Section 1. MINNEAPOLIS, CITY OF; POWERS AND DUTIES RELATING TO CIVIL RIGHTS AND HUMAN RELATIONS. In addition to all other powers conferred by statute or charter, the city council of the city of Minneapolis *may,* by ordinance, *grant* to any Minneapolis human rights, human relations, or civil rights commission, department, or director, *any and all powers and duties* which are granted by Minnesota Statutes 1974, ch. 363 to any state human rights, human relations, or civil rights commissioner, department, or state board. (Emphasis added).

Laws 1975, ch. 82 (not codified).

 Although the court of appeals agreed that the enabling statute, by its plainly permissive language, does not require procedures identical to those set forth in ch. 363 for the State Human Rights Department, it concluded that since the MCCR acts as "prosecutor, judge and jury," an independent hearing examiner should have been appointed in the present case. We do not agree with this conclusion.

Title VII of the Minneapolis Code of Ordinances establishes both a Department of Civil Rights (§ 141.80) and a Commission on Civil rights (§ 141.10). Under § 141.50, complaints are filed and preliminarily inves-

tigated by the Department of Civil Rights. It is the department that makes the determination as to whether there is probable cause to go forward with the complaint. Sec. 141.50(c). Once a complaint is referred to the commission, the hearing procedure is governed by § 141.50(h) wherein the chairperson of the commission designates a three-member hearing panel, at least one of whom is a lawyer, to serve as the hearing committee. Under this structure, the Commission acts only as the judge, not as the prosecutor.

Our cases which have advocated or required the appointment of a hearing examiner are distinguishable from the present case. In the line of cases beginning with *Liffrig v. Independent School District #442, Oslo,* Minnesota appellate courts have been critical of proceedings where school boards have sat in judgment on their own actions. 292 N.W.2d 726 (Minn.1980); *see also Ganyo v. Independent School District #832,* 311 N.W.2d 497 (Minn. 1981); *Schmidt v. Independent School District #1,* 349 N.W.2d 563 (Minn.App. 1984). However, in these cases, there was a clearly demonstrated retention by the school board of both the investigative and adjudicative functions.

The MPD argued that the commission's investigations of the police department's internal affairs and decoy units as well as its treatment of minority citizens had compromised its ability to act impartially toward the MPD. We do not believe that the record supports a conclusion that the commission was unable to fairly judge the facts of this case.[2] The MPD's brief does not conclusively demonstrate a bias on the part of the three hearing panel members. The MPD provided no evidence about the positions that these particular panel members might have taken or their actual involvement in prior police department investigations. Their attendance at commission meetings where police activities were discussed appears at best a fragile connection.

Given the concern for local action inherent in the powers and duties assigned to the commission by the city council, it appears that the council intended that MCCR should be given some leeway to research, study, investigate and publicly inquire into issues or activities having community-wide significance. There might very well be times when a demonstrated friction between the MCCR and an investigated party would warrant the appointment of an independent hearing examiner. But that friction must be demonstrated by more than evidence that the MCCR has merely been fulfilling its other functions. Under the facts of this case the appointment of an independent hearing examiner was not warranted. Such an appointment lies within the discretion of the MCCR; we find no abuse of that discretion. In all other respects the decision of the court of appeals is affirmed.

Affirmed.

AMDAHL, C.J., and POPOVICH and YETKA, JJ., concurring in part, dissenting in part.

POPOVICH, Justice (concurring in part; dissenting in part).

While I concur in that portion of the majority opinion relating to the *McDonnell Douglas* analysis, holding that Sterling failed to establish a prima facie case of employment discrimination, I respectfully dissent from that portion of the opinion holding the appointment of a hearing examiner was not warranted.

1. I believe this court should extend the trend in Minnesota toward the increasing use of hearing examiners and would affirm the court of appeals' advice that a hearing examiner should have been appointed. Even the dissent in that court saw the potential unfairness when a reviewing body acts as prosecutor, judge and jury; in fact, it went further than the majority, saying,

---

2. In reaching a decision, we confine our review to arguments presented in the parties' briefs as well as the pre-appeal record established by the commission, and did not consider MCCR minutes which were submitted by the MPD for the first time as an appendix to its appellate brief. We judge these minutes not to be a part of the record as mandated by Minn.Stat. § 14.68, and explicated in R.Civ.App.P. 110.01 and 130.01.

"[T]he facts of this case *require* that the Commission appoint an independent hearing examiner." *Minneapolis Police Dept. v. Minneapolis Commission on Civil Rights*, 402 N.W.2d 125, 134 (Minn.App. 1987) (Foley, J., dissenting; emphasis added).

2. In *Kroll v. Independent School District No. 593*, 304 N.W.2d 338, 345 (Minn. 1981); *Ganyo v. Independent School District No. 832*, 311 N.W.2d 497, 499 (Minn. 1981); and *Liffrig v. Independent School District No. 442*, 292 N.W.2d 726, 730 (Minn.1980), we were critical of school boards sitting in judgment on their own actions and recommended the use of hearing examiners. In *Swanson v. City of Bloomington*, 421 N.W.2d 307, 312 (Minn. 1988), we noted with approval a city's hiring a state hearing examiner in a complex zoning matter. The court of appeals followed our lead in *Pinkney v. Independent School District No. 691*, 366 N.W.2d 362, 365 (Minn.App.1985), and in *Schmidt v. Independent School District No. 1*, 349 N.W. 2d 563, 567 (Minn.App.1984). The appearance of unfairness should be avoided in adjudicatory proceedings. *See, e.g., Safeco Insurance Company v. Stariha*, 346 N.W. 2d 663, 666 (Minn.App.1984).

3. The MCCR is not a judicial body. Minneapolis Code of Ordinances Sec. 141.40 defines its mission in part as follows:

(1) Seek to prevent and eliminate bias and discrimination because of race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, age, marital status, or status with regard to public assistance, by means of education, persuasion, conciliation and enforcement, and utilize all of the powers at its disposal to carry into execution the provisions of this title.

Like a school board, this body has responsibilities that potentially conflict with its concurrent duty to hold impartial, quasi-judicial hearings.

4. The Minneapolis Police Department timely requested a hearing examiner. MCCR could have followed the procedures in Minn.Stat. § 363.05, subd. 1(18) (1984), regarding the appointment of a hearing examiner as is required of the State Department of Human Rights. *See also* Minn.Stat. § 363.06, subd. 4(3) (1986).

5. Dissenting from a decision relating to liquor license revocation, Justice Scott (joined by Justices Todd and Yetka) stated the point well:

An impartial hearing examiner is necessary in order to insure a fair hearing. A proceeding characterized by bitter neighborhood complaints, a possibly less than neutral city council, and a presiding council member who is not well-acquainted with evidentiary rules—all facets of the present license revocation proceeding—hardly seems impartial. *Procedural fairness in the decision-making process was not possible in this case without separating the decision-making functions from those of investigation and advocacy.*

*Hymanson & Lucky Lanes, Inc., v. City of St. Paul*, 329 N.W.2d 324, 329 (Minn.1983) (emphasis supplied). Chief Justice Amdahl, in a special concurring opinion, added, "For future cases, barring some unforeseen and unusual circumstances, I would support the view of the minority." *Id.* at 328. The same reasoning should apply in this matter.

6. Wherever possible, in my view, "[j]udging should be separated from functions that are incompatible with judging." 3 K. Davis, *Administrative Law* § 18.1 at 340 (2d ed. 1980). Thus, I believe the decision-making process of the MCCR should be separated from advocacy and its other functions—by having a neutral hearing examiner conduct an impartial hearing and make findings of fact and conclusions of law as recommendations to the MCCR for its final disposition. I think this is the better practice, and I would strongly recommend it in the future. Because it appeals to a common sense of fairness, this practice might also reduce recourse to the court system by parties who feel administrative procedure did not afford them a fair hearing.

AMDAHL, Chief Justice.

I join in the special concurrence and dissent of Justice Popovich.

YETKA, Justice.

I join in the special concurrence and dissent of Justice Popovich.