Jane F. **BERSIE**, Appellant,

v.

**ZYCAD CORPORATION**, Respondent.

No. C9–86–902.

Court of Appeals of Minnesota.

Jan. 13, 1987.

Donald E. Horton, Jr., Minneapolis, for appellant.

Lee A. Bernet, III, St. Paul, for respondent.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

Bersie appeals from the trial court's decision, assisted by an advisory jury, that she was not subjected to sexual harassment or discrimination while an employee of Zycad Corp. Appellant alleges the trial court's findings and conclusions of law are inadequate because they do not explicitly refer to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 test. We agree and remand for findings pursuant to *Sigurdson v. Isanti County*, 386 N.W.2d 715 (Minn.1986). Judgment vacated. Remanded for findings.

## FACTS

Jane Bersie was hired in March 1982 as senior systems analyst programmer by Zycad Corporation (Zycad), a newly formed company on the "cutting edge" of computer technology. Bersie, who has a masters degree in mathematics and formerly sought to teach mathematics, joined the small cadre of electrical engineers seeking to develop products and a clientele in the super computer area. Bersie's responsibilities included "maintaining operating systems, being up to date and knowledgeable on the operating systems that we (Zycad) were using, and being the expert on those systems." Bersie was contacted and hired by Harley Horsager, Zycad's new software manager, who had been impressed by her work as an independent contractor with his previous employer.

During her 16 months with Zycad, Bersie, a 39-year old mother of two, endured several incidents which appear to be sexually motivated. Appellant's first experience with harassment occurred in June 1982, upon the hiring of David Allenbaugh, a supervisor (but not Bersie's supervisor). Appellant Bersie testified:

> Well, he started with the company and so I went over to his office to say welcome to the company and glad you're here and things. And he said to me, you know, my last job I worked with a woman who was hired only because she was a woman. And I said, well, I mean, I was a little shocked. I mean, I thought I came over to say hello and welcome him to the company. And I said, well, that is certainly not true in my case. I am an excellent programmer. You shouldn't have to worry about that and he said to me, she didn't know that. Then he started talking. He said that he had just been on a business trip and related that he went walking in the evening and he was stopped by a couple of prostitutes. And he told, I don't know, they propositioned him or whatever, and then he turned to me and he said, why don't you just do that for a living, Jane? And I just glared at him. I didn't say anything. I just glared at him. And he said it again. He said, why don't you just do that for a living, Jane? And I said, well, there is no future in it, and kind of chuckled a little or whatever but I was insulted.

This episode occurred in the presence of a temporary employee, an engineering student, who was not called as a witness.

Allenbaugh, in concert with two other employees, Gilson and Olson, created a similar situation in June 1983. Bersie worked with a man from General Electric on a conversion program she had authored. They had spent several days together working and he called with questions when he returned to his home office. Apparently, after Bersie had finished the project with the man from GE, she was approached by her three co-workers.

\* \* \* Mr. Olson and Mr. Gilson and Mr. Allenbaugh were all together and kind of called me over and I went over and they said, well, we understand you're really tight with this customer. Maybe we should tell your husband. And I said, go ahead. What else did I say? Well, isn't that how business is done or something. And one of the fellows said, did you see in the paper where Control Data has been fined for obtaining prostitutes for their customers? And I said, no, I didn't see that. And I left the office.

Olson, who had been hired in 1983, initiated offensive contact with Bersie on at least three occasions by massaging her neck and shoulders. Bersie did not invite such contact, nor did she like it. However, she never complained.

Bersie testified that Jeannie Mehlhoff, a founder of Zycad, witnessed Olson's behavior and commented to the effect "she (Mehlhoff) liked that he (Olson) did that." Olson also had a tendency to call Bersie "sweetheart" and "doll;" however, she never complained and Olson referred to other women in a similar manner.

Olson intimidated Bersie on another occasion by rolling his chair towards Bersie, who was seated. She retreated, talking business all the time. When she was cornered, Olson thrust his face directly in front of hers, only inches apart. She talked and stared, eventually he backed off. She said nothing.

Bersie stated that Olson verbally harassed her by commenting "Wow, you changed your body, it looks really good." Another time he asked whether her mother knew she "worked in a place like this."

Gilson physically intimidated her on two occasions by blocking her path to the lab and demanding to know what her business was in using the lab. On one occasion a fellow employee intervened on Bersie's behalf; the second time, Bersie kicked him.

Another explicitly sexual occurrence was the handiwork of Jeannie Mehlhoff. As a "celebration" of a male employee's 40th birthday, Mehlhoff decorated the employee's cubicle with nude pictures of women and crepe paper. Bersie glimpsed the display and "stayed away from it." Richard Offerdahl, the company's president saw the pictures and commented that the whole thing was inappropriate for the office. However, he did not explicitly order the pictures removed.

Bersie suffered from the three engineers' behavior in other less obvious ways. Once, Gilson called her at home, after she had worked late on a project, and goaded her about her absence from work, as if it was peculiar and unjustified. On another occasion two of the men turned off a computer so that she looked foolish in front of Harley Horsager, when she had to figure out why things weren't working. Allenbaugh caused particular problems with her work because he twice gave Bersie the runaround on projects. Once he kept altering his design request, forcing appellant to create various programs and finally deciding the initial effort was the best. This caused her to get behind on an important project assigned to her. When Bersie requested his help on a major project, he said next week, and next week still hadn't arrived more than a month later. Finally, Allenbaugh admitted he did not understand what was needed and could not help her.

Bersie eventually left her job on August 4, 1983, but the circumstances are uncertain. Apparently, she quit and changed her mind a short time later. The company felt she was a liability and was not meshing with their projects and people; the company refused to accept her back. She claims she was, in effect, discharged.

Respondent Zycad admits Bersie was pursued by the company and was initially a valuable employee. When she was hired, the company was still in the developmental stage. Zycad states she was eventually left behind by the company's increasingly complicated work. For example, an important project was delayed because of Bersie and the contract eventually lost due to the delay. She also lost a portion of a necessary file prior to an important computer convention. Horsager testified to her history of delay and problems as well as her few successes. The company apparently planned to help Bersie out by hiring a worker to assume some of her work, freeing her for projects she could handle. However, since the situation was accelerating out of control, the plan never came to fruition.

Horsager said he often met with Bersie trying to help her out. During their conversations, she never complained of sexual harassment, although she mentioned general problems with the electrical engineers. Bersie had acquired a reputation as a difficult person to work with. She was a moody person, not quick to smile and a bit of a complainer. Horsager said because of this he preferred to avoid Bersie. Bersie eventually concluded she was at a disadvantage since she was not an electrical engineer. Appellant believed the electrical engineers lacked respect for her since she possessed only a math background. Bersie apparently became obsessed with this distinction in training by the end of her stay with Zycad. She admitted to being paranoid over her position as a result and decided she was on her way out at Zycad. And in her meetings with Horsager, her only complaints of a discriminatory nature focused on her belief that the female support staff was jealous of her professional status. Bersie was also unhappy no women asked her out to lunch.

Appellant emphasizes she was doing an excellent job all along, as demonstrated by her bonus and laudatory letter in June, just prior to her leaving. The company says that the bonus was delayed from March to coincide with the completion of an important project, and that all employees received the same letter, except that the salutations differed. Offerdahl, Zycad's president, said he discussed personnel with Horsager and Bersie's name often came up. They once rated employees at a lunch and Bersie ranked at the bottom. However, just as Bersie never complained of sexual harassment to Horsager, so he never really criticized Bersie for her work. Horsager said he felt responsible for her since he brought her into Zycad. He recognized her growing lack of confidence as the complexity of the work increased; as a result he sought to build her up, rather than to criticize and tear her down.

## ISSUE

Did the trial court provide adequate findings for appellate review?

## ANALYSIS

This appeal is from the judgment. There were no post-trial motions. Appellate review is consequently limited to whether the evidence sustains the findings of fact and the findings support the conclusions of law. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (Minn.1976).

The standard of review is whether the trial court's findings were clearly erroneous. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn. 1983).

> Under this standard, the findings of the trial court will not be disturbed if they are reasonably supported by evidence in the record considered as a whole.

*Id.* However, the "clearly erroneous" cannot be applied here since the trial court failed to make findings as required by Minn.R.Civ.P. 52.01. That rule applies whether the trial is to the court alone or with an advisory jury.

In *Sigurdson v. Isanti County*, 386 N.W.2d 715 (Minn.1986) (released after the trial court's order for judgment), the supreme court stated:

> Because of the significance of factual issues in employment discrimination

cases and the attendant deference that must be accorded trial courts in making their determinations on these issues, it is important that the basis for the court's decision be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review. * * * Thus, we hold that in employment discrimination cases involving claims of disparate treatment and brought under the Minnesota Human Rights Act, the trial court, in making its findings of fact and conclusions of law, must explicitly apply the three-step *McDonnell Douglas* analysis.

*Id.* at 721. Because the trial court made no reference to the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), factors in the order for entry of judgment, the case must be remanded for more complete findings.

The facts in this case give rise to the claim of sexual harassment, not as demands for sexual favors, but rather as the creation of an offensive work environment for an individual based on gender.

The Minnesota Human Rights Act protects individuals from discrimination and harassment based on their sex.

Subd. 10. Discriminate. The term "discriminate" includes segregate or separate and, for purposes of discrimination based on sex, it includes sexual harassment.

Subd. 10a. Sexual harassment. "Sexual harassment" includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:

 *   *   *   *   *   *

(3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment; and in the case of employment, the employer knows or should

know of the existence of the harassment and fails to take timely and appropriate action.

Minn.Stat. § 363.01 (1984).

Analytical methods utilized by the federal courts in Title VII actions have been accepted and applied by the Minnesota Supreme Court in cases arising under the Act "because of the substantial similarities between the two statutes." *Sigurdson,* 386 N.W.2d at 719.

Bersie's claim is properly analyzed using the three-stage test initially developed in *McDonnell Douglas.* She claims disparate treatment based on gender, meaning she has been treated less favorably by Zycad as a result of her sex. *See Sigurdson,* 386 N.W.2d at 719 & n. 1. Bersie can make her prima facie case by showing the "bare essentials" of discrimination or harassment, merely "sufficient" evidence to create the inference of unequal treatment. *See Danz v. Jones,* 263 N.W.2d 395, 399–400 (Minn. 1978). The burden then shifts to Zycad to show a "legitimate non-discriminatory reason for its actions." *Sigurdson,* 386 N.W.2d at 720. This is simply "the burden of going forward with the evidence." *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C. Cir.1981). The burden shifts again to Bersie to show, by a preponderance of the evidence, that the supposedly legitimate reason asserted by Zycad is actually a pretext for the discriminatory action. *Sigurdson,* 386 N.W.2d at 720.

Bersie claims the actions of Allenbaugh, Olson, and Gilson created an "intimidating, hostile, or offensive employment environment" and Zycad was aware, or should have been aware, of the harassment. Her employment was directly affected since she claims both an abusive working environment and that she was fired by Zycad. (However, there is no requirement that an individual show tangible job detriment to state a claim.) The United States Supreme Court has recently addressed the question of sexual harassment, but it utilized no particular analytical method. The court only stated that

[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Meritor Savings Bank, FSB v. Vinson,* — U.S. ——, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982)). *Henson,* however, provides a framework for analyzing harassment claims which neatly fits into the three stage *McDonnell Douglas* test. *See Klink v. Ramsey County,* 397 N.W.2d 894 (Minn. Ct.App. 1986) (*Henson* test adopted in harassment cases).

*Henson* focuses on five factors which can demonstrate sexual harassment and can be used to make the prima facie case.

1. Did the employee belong to a protected class?
2. Was the employee subject to unwelcome sexual harassment?
3. Was the harassment complained of based upon sex?
4. Did the harassment complained of affect a "term, condition, or privilege" of employment? (Or, more exactly, in Bersie's case did the harassment create an "intimidating, hostile, or offensive working environment?")
5. Respondeat superior (did the employer know or should the employer have been aware of the harassment?).

*Henson,* 682 F.2d at 903–05.

Elements one and two are obvious and easily satisfied in this case. As for element three, several statements indicate that "but for the fact of her sex, [Bersie] would not have been the object of harassment." *Id.* at 904. Element four also appears satisfied since the harassment, while apparently not constant and ongoing on a daily basis, was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Id.* Finally, since Allenbaugh was a supervisor and Mehlhoff a company executive, Zycad may well be responsible for their actions. *See Tretter v. Liquipak In-*

*ternational, Inc.,* 356 N.W.2d 713, 715 (Minn.Ct.App.1984).

Since the first step in *McDonnell Douglas* is a prima facie showing, and consequently a credible showing is all that is required, our reading of the facts indicates Bersie shifted the burden to Zycad. The trial court's actions, even absent explicit findings, suggest a similar reading of the evidence. If Bersie had not presented a prima facie case, a directed verdict should have been ordered.

Zycad claims that Bersie voluntarily left her job. However, she may still claim she was forced out as the result of her hostile environment and therefore her resignation was a "constructive discharge."

A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination.

*Continental Can Co. v. State,* 297 N.W.2d 241, 251 (Minn.1980).

Zycad portrays Bersie as an individual overwhelmed by her duties and work relations due to the extremely sophisticated and technical nature of the business who found it increasingly difficult to cope with project deadlines and lacked ability to get along with co-workers. Her inability to measure up to the job would have justified her dismissal. With regard to her work history and ability, Zycad seemingly presented a legitimate reason which shifted the burden back to Bersie. Zycad also demonstrated that Horsager and Offerdahl were unaware of sexual harassment by other employees since Bersie never complained. At the third stage of analysis the question simply becomes whether Bersie showed, by a preponderance of the evidence, that Zycad's reasons were pretext. In essence, did Zycad discharge her based on sex or knowingly allow her to endure an intimidating and hostile environment which affected her employment? The ultimate weighing of the evidence rests with the fact-finder. We remand to the trial court to analyze and evaluate the evidence, and make findings pursuant to *Sigurdson.*

## DECISION

Because meaningful review is not possible, we remand for an explicit *McDonnell Douglas* analysis and appropriate findings as required by *Sigurdson*.

Judgment vacated. Remanded for findings.