**MINNEAPOLIS POLICE DEPARTMENT, Relator,**

v.

**MINNEAPOLIS COMMISSION ON CIVIL RIGHTS, Diane Sterling, Respondents.**

**No. C5–86–1061.**

Court of Appeals of Minnesota.

March 10, 1987.

Review Granted May 18, 1987.

Robert J. Alfton, City Atty., Scott Reeves, Asst. City Atty., Minneapolis, for relator.

Nancy Z. Berg, Minneapolis, for Minneapolis Commission on Civil Rights.

David K. Nightingale, Fuchs Law Office, St. Paul, for Diane Sterling.

Heard, considered, and decided by RANDALL, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

WOZNIAK, Judge.

Appellant Minneapolis Police Department appeals the decision of respondent Minneapolis Commission on Civil Rights (MCCR) finding the police department ·committed discriminatory practices and took retaliatory action against Diane Sterling, a po-

lice clerk who alleged employment discrimination. We reverse.

## FACTS

Diane Sterling, a white woman, began employment as a police clerk in the transcription unit of the Minneapolis Police Department in 1981. Kathy Scott, also a white woman, worked in the transcription unit with Sterling.

Police clerks were responsible for typing police reports from oral statements or handwritten drafts and distributing departmental mail. Transcription unit personnel were divided into three shifts, four clerks per shift. Each employee alternated to the next shift monthly.

Sterling alleges that from the beginning of her employment as a police clerk, she was subjected to loud, profane verbal abuse from Scott. Employees, including supervisory personnel, stated that racist comments were common in the department.

The police department did not condone the use of racial slurs. An employee handbook rule precluded racial slurs. Further, a memo written by Chief Bouza ordered that employees stop using racist and sexist language. This directive was printed on a poster, but at some time was torn off the wall by Sterling's co-workers and never replaced. Until March 10, 1982, *none* of the racial slurs was directed at Sterling and she did *not* report them to her supervisor.

The precipitating incident occurred on March 10, 1982, when Scott and Sue Hilde, also a police clerk, were working the 11:00 p.m. to 7:00 a.m. shift. That evening, Sterling participated in a ride-along, accompanying a black police officer, Ron Bender, on part of his shift from midnight until about 5:00 a.m. When Sterling and the officer returned and walked past the transcription office, Sterling heard Scott yell something. Sterling continued walking with the officer. After booking an individual arrested for DWI, Officer Bender asked Scott to type up his report. She refused and walked away from him.

Sterling later questioned her co-worker, Sue Hilde, about Scott's comments. Hilde stated that Scott had said "That f____ing broad. That gray bitch. It makes me sick. Nigger· lover. Gray lady." The term "gray lady" means a white woman who associates with black men.

On March 11, 1982, Sterling filed a written complaint with her supervisor, Steven Soucy. Soucy forwarded the complaint to his supervisor, Lt. Edward Donaldson. Lt. Donaldson, together with Sterling, took the complaint to Police Chief Anthony Bouza.

On March 15, 1982, at Bouza's direction, Soucy and Lt. Donaldson met with Scott and the union representative. Scott denied making racial remarks. Bouza referred the complaint, together with the statements taken from Sterling, Scott, and Hilde, to Captain Lutz of the Internal Affairs Office of the police department.

On April 8, 1982, Sterling received a letter from Soucy and Lutz stating that the investigation had not produced sufficient evidence to substantiate Sterling's complaints. Sterling was dissatisfied with the finding and requested the Minneapolis Affirmative Action Office intervene on her behalf. Consequently, Deputy Police Chief Patrick Farrell of the Internal Affairs Office reinvestigated the complaint.

Deputy Chief Farrell convened an informal hearing on May 4, 1982, at which Sterling and Scott were present. After the hearing, Farrell concluded the information substantiated Sterling and Hilde's allegations of racial slurs. He recommended that Scott be reprimanded for using racially offensive remarks and discriminatory practices towards minority officers. Farrell also recommended that Sterling be reprimanded for failing to report Scott's conduct for six months.

On May 6, 1982, Chief Bouza accepted Farrell's recommendation regarding Scott and imposed a three-day suspension, without pay. He rejected Farrell's recommendation regarding Sterling.

Scott was permitted to select three consecutive days, within a limited period, for her suspension. The police department's

regular practice was to allow employees to choose, within a limited period, their suspension days. She chose her suspension days to coincide with a 14-day vacation that she had already planned. Soucy changed Hilde's schedule to accommodate Scott's suspension. After Scott's suspension, Hilde and Sterling were transferred to day shift while Scott remained on evening shift. The reassignment balanced the experience levels of personnel so that the least experienced clerks, Sterling and Hilde, would be on the same shift as the most experienced clerks.

On May 26, 1982, Sterling filed a complaint with the Minneapolis Department of Civil Rights alleging harassment and retaliation. Sterling alleged that, following the March 10, 1982 incident, she was subjected to intense hostility on the job. She claimed she was ostracized, embarrassed, subjected to verbal abuse, and that police officers refused to give her work.

Soucy asked Sterling to transfer to another department after she was given an unfavorable work evaluation due to her severe hand dermatitis. Apparently, the transfer was not entirely in Soucy's control because, on June 24, 1982, Sterling requested, but did not receive, a transfer. On July 16, 1982, upon the recommendation of her physician and attorney, Sterling took a medical leave from employment. Soucy opposed Sterling leaving work during the busy summer season and repeatedly asked her to return to work.

Sterling claimed her recurrent rashes were aggravated by a stressful work situation, and filed a claim for workers' compensation for dermatitis of the hands and feet. She stipulated to settlement for $1,966.

Finally, the Minneapolis Civil Rights Department referred Sterling's complaint to the MCCR. A three-member panel of the MCCR conducted a contested case hearing on the complaint. The MCCR held that

Sterling established discrimination based on the racially antagonistic attitudes of co-workers and retaliatory actions of the Minneapolis Police Department in violation of Minneapolis civil rights ordinances. It awarded her damages against the police department in the amount of $35,900 for violation of her civil rights and mental anguish and suffering, $7,500 for physical pain and suffering (less $2,000 paid by workers' compensation), $6,000 in punitive damages, and $2,000 in attorney's fees. The Minneapolis Police Department appeals.

## ISSUES

1. Did the MCCR err in failing to appoint a hearing examiner?

2. Did the MCCR err in failing to apply the *McDonnell Douglas* analysis?

3. Was the award of compensatory and punitive damages an error of law, arbitrary and capricious, and unsupported by substantial evidence?

## ANALYSIS

In reviewing administrative law cases, the decision of an administrative agency will be reversed only when it reflects an error of law, the findings are arbitrary and capricious, or the findings are unsupported by substantial evidence. *E.g., Cable Communications Board v. Nor-West Cable Communications Partnership,* 356 N.W.2d 658, 668 (Minn.1984).[1]

### 1. Hearing Examiner.

The Minneapolis City Council may grant to the MCCR "any and all powers and duties" granted by the state Human Rights Act. 1975 Minn.Laws ch. 82, § 1 (not codified). The Act requires the Minnesota Department of Human Rights to refer charges of discrimination in contested cases to a hearing examiner. *See* Minn. Stat. §§ 363.06, subd. 4(3), 363.071 (1982).

---

**1.** We note at the outset that the procedural posture is rather unusual. Sterling did not file a notice of appeal, nor a brief, nor orally argue. Counsel for the MCCR indicated that MCCR was addressing only the hearing examiner issue.

While counsel for the MCCR briefed all the issues in what she described as an attempt to be thorough, she did not orally argue those issues. Hence, Sterling was, to a large degree, unrepresented on this appeal.

Consequently, appellant argues that the MCCR must also refer this case to a hearing examiner.

While the legislature's delegation of "any and all powers and duties" to the MCCR does not require the MCCR to follow the same procedures as outlined in chapter 363, the policy behind the hearing examiner requirement is sound. Hearing examiners provide an independent unbiased review, beneficial in contested hearings. Regarding school board hearings on teacher termination or discharge, the supreme court, while not specifically requiring a hearing officer, stated:

> We have questioned the fairness of termination proceedings under our current statute, which permits local school boards to exercise the three-part role of prosecutor, judge and jury.

*Ganyo v. Independent School District No. 832*, 311 N.W.2d 497, 499 n. 2 (Minn.1981). However, in *Schmidt v. Independent School District No. 1*, 349 N.W.2d 563, 568 (Minn.Ct.App.1984), we mandated the employment of a hearing officer, absent unusual or exceptional circumstances.

The MCCR also acts as prosecutor, judge, and jury. It reviews complaints and determines whether to pursue the complaint; members of the MCCR then preside over the hearing and make the final decision and award damages.

■ Moreover, the record of the MCCR reveals that, in numerous proceedings before it, the MCCR has made gratuitous statements critical of the Minneapolis Police Department, which appear to indicate an unfair bias against the department.[2] Where proceedings lack fundamental fairness, it is appropriate to use a hearing examiner. *See Liffrig v. Independent School District No. 442*, 292 N.W.2d 726, 730 (Minn.1980).

■ Both the status of the MCCR and its bias against the police department indicate a need for the appointment of a hearing examiner. While we may agree with the dissent's conclusion that a hearing examiner is proper in all local hearings, we decline to order the Minneapolis City Council to enact ordinances requiring a hearing examiner. It is out of this court's judicial purview; rather, it is for the Minnesota Supreme Court or the Minneapolis City Council to decide whether hearing examiners are always required at the local level. Accordingly, we only advise the MCCR of the fundamental fairness of employing a hearing examiner in the future to preside over contested hearings.

### 2. The *McDonnell Douglas* Standard.

In employment discrimination cases, the Minnesota Supreme Court requires the trial court to explicitly apply the three-step *McDonnell Douglas* analysis in making its findings of fact and conclusions of law. *Sigurdson v. Isanti County*, 386 N.W.2d 715, 721 (Minn.1986). The significance of issues in employment discrimination cases necessitates that "the basis for the court's decision be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review." *Id.* at 721.

■ The MCCR failed to utilize the *McDonnell Douglas* analysis either expressly or implicitly. Although the courts have not ruled on whether a commission must also follow the analysis as a trial court must do, we now hold, in the interests of fairness and uniformity and to facilitate meaningful and effective review, commissions must also apply the *McDonnell Douglas* test in employment discrimination cases.

■ The *McDonnell Douglas* analysis consists of a prima facie case, an answer, and a rebuttal. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). To prove a prima facie case, a complainant

---

**2.** The MCCR brought a special term motion to preclude consideration of the Minneapolis Police Department's appendix, arguing that previous decisions of the MCCR contained therein were not part of the record. We now order that this appendix is a matter of public record and, therefore, was appropriately submitted for our review.

must show, by a preponderance of the evidence, the employer intended to discriminate with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment. *See* Minn.Stat. § 363.03, subd. 1(2)(c). The record clearly shows that Sterling failed to prove a prima facie case.

### A. *Co-workers Created Racist Environment.*

In attempting to establish a prima facie case, Sterling first argued that co-workers created a pervasive racist environment. While a complainant may prove discrimination through a co-worker's, rather than the employer's, discrimination, an employer may be liable only where the "employer knows or should know of the condition and permits it to continue without attempting to 'discourage' it." *Continental Can Co. v. State of Minnesota,* 297 N.W.2d 241, 247 (Minn.1980) (quoting *Friend v. Leidinger,* 446 F.Supp. 361, 383–84 (E.D.Va.1977), *aff'd,* 588 F.2d 61 (4th Cir.1978)).

While the Minneapolis Police Department knew of a few employees' racial bias, Sterling was unable to show that the department failed to discourage racial discrimination. In fact, the department instituted rules and directives prohibiting racism.

█ Moreover, racial slurs and epithets directed at people other than Sterling are not sufficient, by themselves, to establish her prima facie case of discrimination. As the Eighth Circuit Court stated in *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981), not all racial slurs rise to the level of discrimination. Where the racial terms were limited to casual conversation and were rarely, if ever, directed at Sterling, there is no basis for a discrimination claim. Racial comments that are merely part of casual conversation, are accidental, or are sporadic, do not trigger discrimination sanction. *Id.* In this case, Sterling alleges only a few general allegations of harassment by unknown individuals, never alleging specific incidents of continual or employer-condoned racism.

### B. *Scott's discriminatory conduct.*

Sterling argued that the remarks directed about her to another on March 10 constitute discrimination. First, no evidence suggested the police knew of Scott's conduct prior to the March 10, 1982 incident. No one had ever complained that Scott had made discriminatory remarks or had refused services to minority officers before the March 10, 1982 incident. Sterling herself testified that she was never the subject of any racially-derogatory remarks before the March 10 incident. She further testified she did not complain, either orally or in writing, of racial discrimination directed toward her or others, with the exception of the single March 10, 1982 incident.

Second, after the Minneapolis Police Department knew of Scott's conduct, it took immediate steps to preclude Scott from further discriminating against co-workers. *Continental Can* illustrates the steps an employer can take to preclude co-workers' discrimination:

> The plaintiff alleged that he had been subjected to racial harassment by his co-employees. The employer was not liable because in response to plaintiff's complaints, management transferred him to another shift, held frequent meetings with him and the head of his department, disseminated the company's anti-harassment policy to all employees, and took disciplinary action against the harassers.

*Continental Can,* 297 N.W.2d at 248.

Similarly, here the police department took timely and adequate action immediately after Sterling's complaint. Supervisor Soucy immediately warned Scott, both verbally and by letter, commenced an investigation, disciplined Scott with an unpaid three-day suspension, and transferred Sterling to another shift. Thus, the employer's immediate action, both on the general racial slurs and the specific incident of March 10, 1982, shows that it discouraged discriminatory statements or actions by co-workers. *See Klink v. Ramsey County,* 397 N.W.2d 894, 902 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Feb. 13, 1987). No prima facie case of discrimination based on

co-workers' racial slurs and actions was proven.

### C. *Reprisals.*

■ Finally, Sterling argued that the Minneapolis Police Department committed an unfair labor practice when it acted in reprisal against her for her allegations of employment discrimination. A reprisal includes any form of intimidation, retaliation, or harassment committed by an employer against an employee to punish or retaliate against the employee for having made a discrimination complaint. *See* Minn.Stat. § 363.03, subd. 7(2) (1982); *see also Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 444–46 (Minn.1983) (where plaintiff alleged retaliatory discharge for having filed a charge of employment discrimination by defendant).

■ First, Sterling claimed that Scott's punishment was too lenient. By definition, an offender's lenient punishment cannot constitute a reprisal against the complainant because the offender's punishment is unrelated to the complainant's position, wage, or status of employment. *See* Minn. Stat. § 363.03, subd. 7(2).

■ Second, Sterling claimed her reassignment to a different shift constituted a reprisal. The reassignment was not an adverse change for Sterling. It allowed Sterling to remain on the day shift one month longer than she would have otherwise, and most employees prefer the day shift. Reassigning the complainant to a different shift is a viable solution to avoid liability for employment discrimination. *See Tretter v. Liquipak International, Inc.,* 356 N.W.2d 713, 716 (Minn.Ct.App. 1984). Since Sterling's pay, benefits, duties, workload, hours, and job classification remained the same, the record does not support a prima facie case of discrimination founded on the employer's alleged reprisals. Regarding both the racist statements and reprisal allegations, we hold that the evidence does not prove that Sterling was discriminated against on the basis of race. Under the *McDonnell Douglas* analysis, this is failure to prove a prima facie case.

Therefore, we need not address the final two steps of the *McDonnell Douglas* analysis. *Bowen v. Superwood Corp.,* 395 N.W.2d 738, 743 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Jan. 2, 1987).

■ The dissent cites *Bersie v. Zycad Corp.,* 399 N.W.2d 141 (Minn.Ct.App.1987), for the proposition that a remand is necessary when the trial court failed to explicitly apply *McDonnell Douglas.* In *Bersie,* no less than ten incidents of alleged abuse occurred. The *Bersie* situation differs markedly from this case, in which Sterling alleged only one incident of harassment, and in which the police took immediate action. Here, Sterling clearly failed to prove a prima facie case, and a remand would not provide additional evidence necessary to bolster the evidence now in the record. *See Bowen,* 395 N.W.2d at 743.

### 3. **Damages.**

Because Sterling failed to establish a prima facie case of discrimination, appellate review of the damages award is unnecessary; however, the MCCR's serious errors of law in its damage award compel us to comment. The MCCR awarded Sterling $35,920 for violation of her civil rights and mental anguish and suffering. Neither the Human Rights Act nor case law authorized damages incurred for violation of civil rights. Minn.Stat. § 363.071, subd. 2; Minneapolis, Minn., Code of Ordinances § 141.-50(1) (1984).

■ If the violation of an individual's civil rights does not result in actual injury, an award of damages is inappropriate. *Memphis Community School District v. Stachura,* —— U.S. ——, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). An actual compensable injury means physical injury, monetary expenses, lost earnings, impairment of reputation, personal humiliation, or mental anguish. *Id.* In *Stachura,* the Supreme Court reversed a case in which the trial court instructed a jury that it could award compensatory damages for a civil rights violation by placing a money

value on the importance and significance of the right.

> [Constitutional rights] 'do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interest.' Where no injury was present, no 'compensatory' damages could be awarded [based solely on a violation of civil rights].

*Id.* (quoting *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978)). Accordingly, the MCCR's award of damages based in part on a civil rights violation was an error of law.

■ MCCR awarded Sterling an additional sum of $7,500 in compensatory damages for physical pain and suffering. The only evidence of Sterling's physical condition was dermatitis flare-ups. Under Minn. Stat. § 176.031 (1982), once Sterling elected her remedy under workers' compensation, it was her exclusive remedy for the dermatitis condition, and she could not collect damages for the condition in a different action against her employer. *Id.; see Kipka v. Chicago & Northwestern Railway Co.*, 289 F.Supp. 750, 753 (D.Minn.1968).

■ With regard to the award of punitive damages, the MCCR made no findings or conclusions to support an allegation that the police department acted with a willful indifference to the rights or safety of others as required by Minn.Stat. § 549.-20 (1986). Sterling had the burden to prove such willful indifference by clear and convincing evidence. *See, e.g., Metag v. K–Mart Corp.*, 385 N.W.2d 864, 866–67 (Minn. Ct.App.1986), *pet. for rev. denied* (Minn. June 19, 1986). The record is totally devoid of such evidence.

Punitive damages may be awarded against a principal because of the acts of its agent if the principal authorized the doing and the manner of the act, or the agent was unfit and the principal was reckless in employing him, or the principal ratified or approved the act. Minn.Stat. § 549.20, subd. 2 (1986). Here also, the MCCR made no findings or conclusions supporting any allegation that the police department approved of the discrimination

or supported it. The department separated Scott from Sterling, investigated the complaint, disciplined Scott for her racial slurs, and transferred Sterling back to her old shift when she returned from her medical leave of absence.

## DECISION

The Minneapolis Commission on Civil Rights' decision awarding damages for employment discrimination is reversed.

Reversed.

FOLEY, Judge (dissenting).

I respectfully dissent. While I agree with the majority's conclusion that the *McDonnell Douglas* analysis should be followed in employment discrimination cases before a commission, I disagree with its application of this analysis and its ultimate determination that a prima facie case of discrimination has not been made. I believe the case should be reversed and remanded for appointment of an independent hearing examiner.

In holding the *McDonnell Douglas* analysis applicable to administrative settings as well as judicial forums in cases involving claims of employment discrimination, the majority necessarily extends the *Sigurdson* requirement of *explicit* reference to the *McDonnell Douglas* test in a decision-maker's findings and conclusions of law. The majority nevertheless ignores this clear requirement and applies the first step of the three-part test despite acknowledgment that "[t]he MCCR failed to utilize the *McDonnell Douglas* analysis either expressly or implicitly." If *McDonnell Douglas* is to be applied with equal force to a commission's decision in an employment discrimination case, this court must be provided with a basis for effective and meaningful review. As the supreme court notes in *Sigurdson*:

> [L]ack of explicit application of the *McDonnell Douglas* analysis can present significant problems on review. *Employment discrimination cases often involve intricate factual issues in*

*which only the trial court, with its opportunity to observe witnesses firsthand, can meaningfully assess the weight and credibility of the evidence.* We have traditionally accorded great deference to the trial court in making findings of fact, recognizing that much must necessarily be left to its sound judgment and discretion because it has the advantages of fully hearing the testimony and acquiring a thorough familiarity with all the circumstances of the case. * * * *An appellate court cannot judge the credibility of a witness or the weight, if any, to be given to testimony.* * * * Because of the significance of factual issues in employment discrimination cases and the attendant deference that must be accorded trial courts in making their determinations on these issues, it is important that the basis for the court's decision be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review."

*Sigurdson v. Isanti County,* 386 N.W.2d 715, 721 (Minn.1986) (citations and footnote omitted) (emphasis supplied).

In *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428 (Minn.1983), the supreme court considered all three elements of the *McDonnell Douglas* formula despite the trial court's failure to expressly do so in its findings and conclusions of law. The absence of express findings in that case was not dispositive:

[T]he record developed at trial is thorough, and the trial judge's findings and explanation of his decision are sufficiently complete to permit us to review the record and the decision below within the *McDonnell-Douglas* framework without vacating the district court's judgment and remanding this matter for new findings.

*Hubbard,* 330 N.W.2d at 443 n. 15.

*Sigurdson,* decided three years later, clearly holds that express findings are now required, in accordance with the line of cases represented by *Moylan v. Moylan,* 384 N.W.2d 859 (Minn.1986). *Sigurdson,* 386 N.W.2d at 721 n. 4. In *Bersie v. Zycad*

*Corp.,* 399 N.W.2d 141 (Minn.Ct.App.1987), we followed the mandate of *Sigurdson* and held that the trial court's failure to explicitly apply the *McDonnell Douglas* formula in a sexual harassment case necessitated a remand for further findings.

I further believe that the facts of this case require that the Commission appoint an independent hearing examiner, even though not expressly required by Minn. Stat. §§ 363.01–.14. As the majority notes, fundamental fairness is at issue when a reviewing body acts as prosecutor, judge and jury. The potential for abuse is particularly acute in this case since the MCCR has frequently been critical of the department in the past and its ability to weigh the facts fairly is suspect. Thus, in accordance with *Kroll v. Independent School District No. 593,* 304 N.W.2d 338 (Minn.1981), and *Ganyo v. Independent School District No. 832,* 311 N.W.2d 497 (Minn.1981), I would take a stronger position and hold that absent unusual or extenuating circumstances, a hearing examiner be appointed in this case and in all contested cases involving employment discrimination at the local level. To resolve the matter entirely, the City of Minneapolis should mandate by ordinance that an independent hearing examiner be appointed in all cases where employment discrimination is claimed.

In this case, the independent hearing examiner would first determine whether Sterling has proven employment discrimination by a preponderance of the evidence. The facts are disputed on this issue and are not capable of resolution by this court as a matter of law. For example, it is not clear, as the majority suggests, that the police department took immediate and appropriate steps to preclude discrimination by Sterling's co-workers. Sterling's initial complaint was dismissed for lack of sufficient evidence; the investigation continued only after she expressed dissatisfaction with this response and pursued her concerns with the Minneapolis Affirmative Action Office. The product of this continued investigation was a May 1982 decision by Chief Bouza substantiating Sterling's com-

plaint and noting that the "supervisors involved exhibited either ignorance, indifference or worse in handling this case and in not being aware of this intolerable situation."

In *Bersie*, a case involving a claim of sexual harassment based not on sexual favors but on an offensive or abusive work environment, this court emphasized that "while apparently not constant and ongoing on a daily basis, [the harassment] was 'sufficiently pervasive so as to alter the conditions of employment and create an *abusive working environment.*'" *Bersie*, 399 N.W.2d at 146 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)) (emphasis supplied). The analysis set out in *Bersie*, can and should be utilized in cases such as this, where an employee alleges racial discrimination due to an *abusive work environment* or retaliatory actions by her employer. I would therefore remand so that a trier of fact such as a hearing examiner could weigh the evidence and decide whether a prima facie case of employment discrimination has been made under *Bersie*.