Sharon M. BOUGIE, Respondent,

v.

SIBLEY MANOR, INC.,
et al., Appellants,

Roger W. Diestler, et al., Defendants.

No. C0–92–2367.

Court of Appeals of Minnesota.

Aug. 3, 1993.

R. Donald Hawkinson, Emily Wallace–Jackson, Minneapolis, for respondent.

John E. Daubney, St. Paul, for appellants and defendants.

Considered and decided by NORTON, P.J., and PETERSON and AMUNDSON, JJ.

## OPINION

AMUNDSON, Judge.

Appellants Sibley Manor, Inc. and Robert W. Julen appeal from a district court judgment in favor of respondent Sharon Bougie on her claim of sex discrimination. On appeal, appellants raise issues concerning the statute of limitations, the effect of a prior Pierringer release, and the award of punitive damages. We affirm the district court's decision on the Pierringer release issue, but reverse and remand the award of punitive damages and remand for findings on the statute of limitations.

## FACTS

Appellant Sibley Manor, Inc. owns and operates a large apartment complex located in Saint Paul. Appellant Robert Julen is one of three owners of Sibley Manor, and has an office on the premises.

Defendant Roger Diestler is Sibley Manor's property manager, and reports directly to Julen. Diestler supervises Sibley Manor's maintenance workers, independent contractors, and bookkeeper. Diestler has worked for Sibley Manor since 1964.

In late June or early July 1985, Sibley Manor hired respondent Sharon Bougie as a bookkeeper. Bougie worked in an open office area near Diestler, her supervisor. Bougie was the only female employee at the time, out of approximately ten employees.

The Sibley Manor office area is located on the top floor of a garage/shop area, where the maintenance employees work. The maintenance workers pick up their work orders from the office area each day.

Bougie testified that the office atmosphere at Sibley Manor was "sexually charged." For example, she testified: "There is an employee there that cannot say a sentence without saying f— every other word." The maintenance employee in question, Robert Ritter, used the word in front of Bougie daily. On one occasion, Ritter pushed Bougie onto her desk and kissed her. On several occasions, Ritter asked Bougie to feel his muscles, and rubbed his crotch against her back, buttocks, and thigh.

There was evidence that the maintenance employees brought pornographic material to the office and told off-color jokes and jokes of a sexual nature. One employee described the office atmosphere as similar to a locker room. Often, when women came into the office or walked by on the street, Ritter or other employees commented on the women's bodies. An employee from Northwestern Bell stopped by and told stories and jokes; Bougie referred to him as "blatantly offensive" and "disgusting." Diestler called Bougie "honey" in front of people several different times.

Bougie responded to the objectionable behavior by walking away, exhibiting disgust, or "trying to joke it off." She did not complain about most of the behavior because either Diestler or Julen, or both of them, were present and observed the behavior. Bougie did complain to Diestler at one point when Ritter rubbed up against her, but nothing was done.

Julen admitted that he had witnessed inappropriate sexual jokes told in the office

in Bougie's presence. Julen did not take any action to stop the jokes, because he did not believe they were offensive to anyone. According to Julen, "you can't turn off the world just because there is one lady there."

On one occasion, Julen made a comment about Bougie's sweater, indicating that she had "four bumps" (two were due to shoulder pads in the sweater). Julen subsequently apologized for the remark. Upon two or three occasions, Julen brought Bougie magazines containing singles advertisements, and stated that the magazines might help her. On another occasion, the office was robbed, and Julen asked Bougie for a hug, which she believed was inappropriate.

When Bougie was first hired, Diestler constantly touched her back, shoulders, or hair. Bougie did not invite this behavior. One evening in April 1987, Bougie and Diestler were alone in the office closing up. Diestler pushed Bougie into the safe and kissed her. Initially, Bougie did not welcome the kiss, but she eventually responded, and within two or three days, the two entered into a sexual relationship.

Eventually, in early 1988, Bougie became unhappy with Diestler's attitude about the affair. On May 13, 1988, Bougie presented Diestler with an ultimatum, and Diestler chose to end the affair.

Julen spoke to Bougie and Diestler and tried to work things out at the office; however, after May 13, 1988, the atmosphere became tense. According to Bougie, the "sexually charged atmosphere" became more intense. According to Diestler, however, the atmosphere was tense but not sexually charged. Diestler testified that he tried to stay out of Bougie's way and tried not to antagonize her, but according to Bougie, at least once a week during 1989, Diestler would move as close as he could and trap her at her desk.

During 1989, Ritter was going through a divorce, and it was very common for him to refer to women vulgarly. This occurred daily in front of Bougie. Ritter also made comments about the women he and his friends had gone to bed with the night before. In front of Bougie, Ritter spoke of "[h]ow he had f——ed his brains out."

Several employees described the atmosphere in 1988 and 1989 as tense and uncomfortable. There was testimony that eventually only one maintenance employee, excluding Ritter, was allowed in the office to pick up work orders.

At one point, Julen threatened to fire both Diestler and Bougie. Finally, Julen decided to retain Diestler as an employee, but replace Bougie. Bougie was discharged on October 18, 1989, despite the fact that Julen had experienced no problems with Bougie's work throughout her employment.

On March 16, 1990, Bougie commenced a lawsuit against Diestler, Sibley Manor, Julen, and his father, Donald Julen.[1] Bougie's complaint alleged discrimination based on her sex. Bougie subsequently entered into a Pierringer release with Diestler for $15,000.

Following a trial, the district court issued findings of fact, conclusions of law, and an order dismissing Bougie's claim against Donald Julen, but determining that Sibley Manor and Robert Julen had engaged in an unfair discriminatory practice with regard to Bougie's employment and termination. The court awarded Bougie compensatory damages, future medical expenses, punitive damages, and attorney fees.

The court denied appellants' motion for a new trial or amended findings. Judgment was entered, and Sibley Manor and Julen appealed from the judgment.

### ISSUES

1. Is Bougie's complaint barred by the one-year statute of limitations in Minn.Stat. § 363.06, subd. 3 (1988)?

---

**1.** Donald Julen was one of Sibley Manor's three owners, but lived in Arizona and was not involved in the daily operations of the company.

2. Should Diestler's Pierringer release entitle appellants to a reduction of the judgment against them?

3. Does the record support the award of general damages against appellants?

4. Did Bougie fail to comply with the proper statutory procedures for requesting punitive damages?

5. Did the district court err by awarding punitive damages without making appropriate findings?

## ANALYSIS

### I.

It is an unfair employment practice for an employer, because of sex, to discriminate against a person with respect to terms and conditions of employment. Minn.Stat. § 363.03, subd. 1(2)(c) (1988). "Discrimination" includes sexual harassment. Minn. Stat. § 363.01, subd. 10 (1988). A claim of an unfair discriminatory practice must be commenced in district court "within one year after the occurrence of the practice." Minn.Stat. § 363.06, subd. 3 (1988).

Bougie's complaint was served on March 16, 1990. Appellants claim that any alleged sex discrimination against Bougie ended when the affair between Bougie and Diestler ended, on May 13, 1988. Appellants conclude that since Bougie did not file her lawsuit until after May 13, 1989, her complaint is barred by the one-year statute of limitations of Minn.Stat. § 363.06, subd. 3.

■ Bougie replies that the statute of limitations was tolled as a result of the "continuing violations" doctrine. That doctrine may toll a statute of limitations

> when the discriminatory acts of an employer over a period of time indicate a systematic repetition of the same policy and constitute a sufficiently integrated pattern to form, in effect, a single discriminatory act.

*Hubbard v. United Press Int'l., Inc.*, 330 N.W.2d 428, 441, n. 11 (Minn.1983). Mere continuity of employment, however, does not extend a cause of action for discrimination; rather, the actual violation must continue. *Sigurdson v. Isanti County*, 448 N.W.2d 62, 67 (Minn.1989).

It is Bougie's claim that the "sexually charged" atmosphere at Sibley Manor continued until the date of her termination. The district court made several findings concerning the existence of sexual harassment in the office in 1989, and there is evidence in the record to support the court's finding that Bougie was sexually harassed in 1989. As appellants note, however, the district court did not specifically determine whether the conduct occurred through March 16, 1989—one year before Bougie commenced this action.

■ The record fails to indicate the exact dates upon which the incidents of alleged harassment occurred. In fact, Bougie admits in her brief that "[i]t is impossible to tell from the trial transcript which incidents occurred after March 16, 1989." This absence of specific facts is troubling, in light of the fact that Bougie had the ultimate burden of proof.[2] Even more troubling, however, is the fact that the district court failed to make specific findings or conclusions on the statute of limitations issue.[3] Accordingly, we remand for

---

**2.** Bougie points to the fact that appellants have the burden of providing an adequate record on appeal. The inadequate record, however, is the result of Bougie's own failure to meet her burden of proving when the harassment occurred.

**3.** We also note that the district court did not apply the *McDonnell Douglas* test to the facts of this case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This court has adopted a *McDonnell Douglas*-type prima facie showing for cases involving sexual harassment. *Bersie v. Zycad Corp.*, 399 N.W.2d 141, 146 (Minn.App.1987);

*Klink v. Ramsey County*, 397 N.W.2d 894, 901 (Minn.App.1986), *pet. for rev. denied* (Minn. Feb. 13, 1987). In *Bersie*, the court stated that "the trial court, in making its findings of fact and conclusions of law, must explicitly apply the three-step *McDonnell Douglas* analysis." *Bersie*, 399 N.W.2d at 145 (quoting *Sigurdson v. Isanti County*, 386 N.W.2d 715, 721 (Minn. 1986)). The *Bersie* court concluded that in the absence of findings and conclusions applying the *McDonnell Douglas* analysis, meaningful review was not possible; the court therefore remanded to the trial court for appropriate findings. *Id.* at 147. In the present case, on re-

specific findings on the dates of the alleged harassment and a determination whether Bougie's complaint is barred by the one-year statute of limitations contained in Minn.Stat. § 363.06, subd. 3.

## II.

Appellants argue that the $15,000 settlement paid by Diestler as a result of the Pierringer release should entitle appellants to a reduction of the judgment against them under theories of comparative fault, agency, vicarious liability, or the collateral source rule. Appellants, in citing each of these theories, apparently assume that a portion of the damages award against appellants was based upon Diestler's liability for the sexual harassment.

In Bougie's amended complaint, she specifically alleged sexual harassment by appellants based upon the "sexually charged" atmosphere. Bougie also alleged that appellant Julen was aware of the problem but failed to take any action.

The district court made extensive findings about the atmosphere at Sibley Manor between 1985 and 1989. A large portion of the district court's order was devoted to discussing Julen's knowledge of the situation and his failure to correct it. The court found that there was a pattern and history of harassment in the office which constituted "standard operating procedure;" that the sexual harassment/hostile environment was sufficiently severe and pervasive so as to alter the terms and conditions of employment and interfere with the work of a "reasonable woman;" that Julen knew the behavior was occurring and should have known that it constituted sexual harassment; and that Sibley Manor and Julen engaged in an unfair, discriminatory practice with regard to Bougie's employment and termination.

On its face, the district court's decision does not rest upon theories of liability based upon Diestler's knowledge and actions. Rather, the court concluded that appellants Sibley Manor and Julen were liable based upon the entire "sexually

mand, the district court should make the appro-

charged" atmosphere of the office. Accordingly, the court did not err by failing to reduce Bougie's judgment by the amount of the Pierringer release.

## III.

Appellants cite *Continental Can Co. v. State*, 297 N.W.2d 241, 250 (Minn.1980), where the court concluded that an employer committed an unfair employment practice by failing to take timely and appropriate action when notified by an employee of verbal and physical sexual harassment. Appellants note that in *Continental Can*, the court indicated that the Human Rights statute "does not impose a duty on the employer to maintain a pristine working environment." *Id.* at 249. The *Continental Can* court concluded, however, that "verbal and physical sexual harassment includes sexually motivated physical contacts, sexually derogatory statements and verbal sexual advances." *Id.*

Appellants also cite *Klink v. Ramsey County*, 397 N.W.2d 894 (Minn.App.1986), *pet. for rev. denied* (Minn. Feb. 13, 1987), where the court concluded that an employer was not guilty of sexual harassment by maintaining an offensive work environment. There, the alleged harassment included foul language used in private offices and not directed at the plaintiff, and obscene materials that were kept in offices, desk drawers, or lockers. Finally, when the plaintiff complained, the employer took steps to remedy the situation. The *Klink* court characterized the conduct as "mindless and careless locker room behavior," and distinguished the facts of *Continental Can* and two other cases where the courts had found sexual harassment. The *Klink* court explained:

First, the cases involved sexual touching, advances, statements, and derogatory remarks directed specifically at or to a particular female employee. Second, the employees in the cases expressly complained to managers or supervisors. Finally, the employer, after becoming

priate *McDonnell Douglas* findings.

aware of the sexual harassment, did nothing to remedy the situation.

*Klink*, 397 N.W.2d at 901.

■ In the present case, some of the offensive conduct was directed at Bougie herself. Julen was often present but did nothing to correct the situation.

The *Klink* court noted:

The sexual harassment must be sufficiently severe or pervasive so as "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). In the present case, the district court specifically concluded:

The totality of circumstances demonstrates that the sexual harassment/hostile environment was sufficiently severe and pervasive so as to alter the terms and conditions of employment and interfere with the work of a reasonable woman.

■ The district court's findings should not be overturned by this court if they are reasonably supported by the evidence as a whole. *Klink*, 397 N.W.2d at 900. In other words, we will reverse only where findings are clearly erroneous; i.e., when the findings are "without substantial evidentiary support or induced by an erroneous view of the law." *Id.* In the present case, we conclude the district court's findings were not clearly erroneous.

**IV.**

■ Appellants argue the district court erred by awarding punitive damages, because Bougie failed to follow the proper procedures for pleading those damages. The legislature established the following procedures for pleading punitive damages in civil actions:

Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages.

Minn.Stat. § 549.191 (1988).

■ Bougie did not follow the above procedures; rather, she sought punitive damages in her original and amended complaints. Appellants objected to this procedure in their answer and amended answer. In addition, appellants in their motion for a new trial or amended findings alleged that Bougie was not entitled to punitive damages due to her failure to follow the proper procedures.

Punitive damages, under past practice, were alleged in numerous lawsuits, whether appropriate or not. In order to limit them to the appropriate situations, [section 549.191] only allows punitive damages to be asserted in a motion to amend the initial complaint.

Note, *Introduction to Minnesota's Tort Reform Act of 1986*, 13 Wm. Mitchell L.Rev. 277, 294 (1987). Thus, the purpose of section 549.191 is to ensure that punitive damages are only pleaded in those cases where such damages are appropriate. In the present case the district court ultimately determined that punitive damages were appropriate. Accordingly, the court's initial failure to strike the claim for punitive damages constituted harmless error.

**V.**

Appellants argue the district court erred by awarding punitive damages without making appropriate findings. Punitive damages are allowed "only upon clear and convincing evidence that the acts of the defendant show a willful indifference to

the rights or safety of others." Minn.Stat. § 549.20, subd. 1 (1988).[4]

"Willful indifference" does not imply a purpose of actually intending to harass the plaintiff, but a malicious, reckless or knowing disregard of the plaintiff's rights. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn.1990). In determining punitive damages, the court shall consider the factors set forth in Minn.Stat. § 549.20, subd. 3 (1988).

In the present case, the district court did not make findings addressing the factors included in section 549.20, subdivision 3. Accordingly, the award of punitive damages is reversed and remanded for findings on the statutory factors.

## DECISION

The record supports the district court's award of general damages against appellants. The award of punitive damages is not supported by appropriate findings, and is therefore reversed and remanded. The case is also remanded for specific findings on the statute of limitations issue.

**Affirmed in part, reversed in part, and remanded.**

---

**4.** The punitive damages standard was amended in 1990 to require a plaintiff to show a "deliberate disregard for the rights or safety of others." *See* Minn.Stat. § 549.20, subd. 1(a) (1990). This heightened standard, however, only applies to causes of action arising on or after May 4, 1990. 1990 Minn.Laws ch. 555, § 24.